## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES, *Ex. Rel.*      )
CINDY LEE HARTMAN,        )     CIVIL ACTION
                               )
          Plaintiff       )     Civil Action No. 02-1948
                               )
                               )
                               )
ALLEGHENY GENERAL HOSPITAL,  )
                               )
          Defendant     )

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT'S COUNTER CLAIM

As a rule, counter claims are not permitted qui tam actions. <u>United States Ex Rel Rodriguez v. Weekly Publications Inc.</u>, 74 F. Supp. 763 (S.D. N.Y. 1947), <u>U.S. Ex Rel Madden v. General Dynamics Corp.</u> 4 F.3d 827 ( 9th Cir. 1993), <u>Mortgages Inc. v. United States District Court for the District of Nevada</u>, 934 F. 2d 209 (9th Cir. 1991), <u>U.S. Ex Rel Newsham v. Lockheed Missiles,</u> 190 F. 3d 963 (9th Cir. 1999), <u>United States Ex Rel. Newsham v. Lockheed Missiles and Space Co. Inc.</u>, 779 F. Supp. 1252 (N.D. Cal. 1991), ., See Kent D. Strader, Comment, Counter Claims Against Whistle blowers: Should Counterclaims Against Qui Tam Plaintiff's Be Allowed in False Claims Act Cases?, 62 U. Cin. L. Rev. 713,727-28 (1993).

A counterclaim may be permitted where the defendant seeks independent damages and has plead that the relator committed: a breach of duty of loyalty and breach of fiduciary duty, a breach of implied covenant of good faith and fair dealing, libel, trade libel, fraud, and other acts of misconduct. see <u>Madden</u>.

AGH has not demonstrated any such acts or practices. Defendant's counterclaim must be

dismissed.

Respectfully submitted
BEHREND & ERNSBERGER, P.C.

Daniel W. Ernsberger
Attorney for Plaintiff
PA. I.D. No. 30703

Union Bank Building, Suite 300
306 Fourth Avenue
Pittsburgh, PA 15222

(412) 391-2515

10

# CONFIDENTIAL

### Report of Compliance Audit Findings
### For
### *Allegheny General Department of Cardiology*

### Prepared by: Sharon McElrath
### West Penn Allegheny Health System
### System Compliance and Internal Audit Department

### *October 30, 2002*

## INTRODUCTION

This audit was request by Kathy Deloplaine on behalf of Allegheny General Hospital Department of Cardiology as an investigation prompted by an employee's misconduct. An analysis of billing records provided by the Physician Finance Department was conducted to determine if all services that were provided by the physicians in the nuclear cardiology and non-invasive laboratory departments were reported to the third party carriers. The issues that were investigated were:

- Charges for non-invasive cardiology procedures deleted and not billed to third party carriers;

- Charges for nuclear cardiology procedures deleted and not billed to third party carriers; and

- EKG services reported with a diagnosis of benign pulmonary hypertension instead of hypertension.

## METHODOLOGY

Cardiology services are reported with the Invision billing system for facility charges. These services are then processed to a turn around report that is reviewed by the cardiology biller. The turn around report will list all services reported with a facility charge. It is the responsibility of the biller to verify that a physician affiliated with the Department of Cardiology performed or supervised the testing. If a physician who is not affiliated with the department provided the service, the charges are deleted and not entered into the Signature billing system, the physician billing system. The physician finance department provided deletion reports for an analysis of deleted charges. These reports were compared to the schedules for each department and to any charges that may have already been entered into the Signature system. Any procedure that was identified as being provided by an affiliated physician and not entered into the Signature billing system was identified and provided to PFS for billing.

PLAINTIFF'S
EXHIBIT
A

21000001

## EXECUTIVE SUMMARY

- Nuclear cardiology charges submitted to finance were $68,000 for 78 patients.  Finance is working on a script to enter the demographics for the patients to bill for the services.

- Non-invasive cardiology charges submitted to finance were for approximately $197,000.  Again, finance is working on a script to enter the patient demographics to bill for the services.

- A report was provided to the Compliance Department by PFS listing all services reported with a diagnosis of pulmonary hypertension, ICD code 416.0.  This report was run for the dates of service January 1, 2001 through March 31, 2002.  There was no EKG's reported during this time span with a diagnosis of pulmonary hypertension.

21000002

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CINDY HARTMAN, | CIVIL DIVISION<br>No: 02-1948 |
| Plaintiff, | DEPOSITION OF:<br>KATHY DELOPLAINE |
| vs. | |
| ALLEGHENY GENERAL<br>HOSPITAL, | DEPOSITION DATE:<br>DECEMBER 9, 2004 |
| | REPORTED BY:<br>Mary E. Macioce |
| Defendant. | COUNSEL OF RECORD: |

FOR THE PLAINTIFF:

Daniel Ernsberger, Esq.
BEHREND & ERNSBERGER
Union Bank Building
304 Fourth Avenue
Pittsburgh, PA  15219

FOR THE DEFENDANT:

David R. Johnson, Esq.
THOMPSON, RHODES & COWIE
Two Chatham Center
Tenth Floor
Pittsburgh, PA  15219-3499

MINI - TRANSCRIPT
KEY - WORD INDEXING

DISK
ENCLOSED

# MAXINE JACOBY & ASSOCIATES

## ALLEGHENY BUILDING     SUITE 720
### 429 FORBES AVENUE     PITTSBURGH, PA. 15219

(412)  765-3133          FAX  (412)  765-2704

2

# D E P O S I T I O N

of KATHY DELOPLAINE, taken pursuant to

the Federal Rules of Civil Procedure, by

and before Mary E. Macioce, a Court Reporter

and Notary Public in and for the Commonwealth

of Pennsylvania, in the Conference Room of

BEHREND and ERNSBERGER, Union Bank Building,

Suite 300, 306 Fourth Avenue, Pittsburgh, PA 15222,

on Thursday, December 9, 2004, commencing at 10:03 a.m.

- - -

3

I N D E X

Witness                                          Page

KATHY DELOPLAINE:

Examination by Mr. Ernsberger:                    4

E X H I B I T S

| DEPOSITION EXHIBIT | | MARKED FOR IDENTIFICATION |
|---|---|---|
| No. 1 | Letter 7/31/98 | 39 |
| No. 2 | Audit Results | 40 |
| No. 3 | E-mail | 50 |
| No. 4 | E-mail | 79 |
| No. 5 | Series of e-mail | 123 |
| No. 6 | E-mail | 131 |
| No. 7 | Series of e-mail | 139 |
| No. 8 | Series of e-mail | 141 |
| No. 9 | Series of e-mail | 147 |
| No. 10 | E-mail | 148 |
| No. 11 | Series of e-mail | 148 |
| No. 12 | Series of e-mail | 154 |



Page 4

1   P-R-O-C-E-E-D-I-N-G-S
2     KATHY DELOPLAINE
3    having been first duly sworn, was
4    examined and testified as follows:
5     EXAMINATION
6 BY MR. ERNSBERGER:
7 Q   Good morning. My name is Dan Ernsberger, I
8    am the attorney in this case and I represent
9    the United States of America as the Quatum   I
10   guess they call me a special attorney general
11   for the case, and I also represent Cindy
12   Hartman, what they call the Relator.
13     I'll be asking you several questions
14   today, and if you don't understand the
15   question, please tell me. Okay?
16 A   Yes.
17 Q   Can I have your name and address, please?
18 A   Kathy Deloplaine, 215 Montana Street,
19   Pittsburgh, Pennsylvania 15214.
20 Q   Can you summarize your educational
21   background?
22 A   I have an R.N. Diploma, graduated from
23   St. Francis Hospital School of Nursing in New
24   Castle, and I also have a BS/BA Degree in
25   Nursing and Managed Care Administration.

Page 5

1 Q   When did you get your BS/BA?
2 A   2002.
3 Q   And when did you get your R.N.?
4 A   1974.
5 Q   Can you briefly describe your work experience
6   since getting your R.N. in 1974?
7 A   I worked from 1974 until 1988 in a Critical
8   Care Unit. For the first three years I was
9   an R.N. and a team leader in the Intensive
10   Care Unit -- Medical Intensive Care Unit,
11   Coronary Care Unit, and Progressive Cardiac
12   Care Unit.
13     In 1979 I was promoted to Assistant
14   Clinical Supervisor, and remained in that
15   capacity -- I left there permanently in
16   1988. I had a leave of absence for -- a
17   maternity leave of absence that I returned
18   from in 1985. I had been off for seven weeks
19   and was a rehire in 1985. I also had a brief
20   break in service from September of 1981
21   until, I believe it was November, but I don't
22   recall exactly. It was, approximately, a two
23   month break in service in that year, and
24   returned in the same capacity as an Assistant
25   Clinical Supervisor.

Page 6

1 Q   What is your present position?
2 A   Director of Cardiology at Allegheny General
3   Hospital.
4 Q   When did you become that? When did you
5   acquire that position?
6 A   In March of 2002.
7     I don't believe I fully answered the
8   previous question. You asked me my
9   experience as an R.N., and I didn't
10   completely answer that, I only gave you my
11   critical care experience.
12 Q   Okay.
13 A   In 1988 I left the Critical Care Unit. At
14   that time, I became a research coordinator in
15   congestive heart failure and transplant, and
16   in 1996 I left that position and assumed a
17   position in Finance. I didn't work in an
18   R.N. capacity in the Finance Department, so I
19   would say that was the end of my R.N. career
20   at that point.
21 Q   Okay. And what was your title when you were
22   working in Finance?
23 A   Initially, for the first six months I was a
24   Senior Analyst, I believe. I'm not certain
25   of the exact title. And after six months I

Page 7

1   was promoted to a manager, practice manager.
2   And, approximately a year later, I was
3   promoted to Director of Patient Financial
4   Services in the Pro-Fee Billing Department.
5 Q   Pro-Fee stands for professional fee, does it?
6 A   Yes, it does.
7 Q   Okay. You were a Senior Analyst, Project
8   Manager, Director of Patient Financial
9   Services?
10 A   I wasn't a project manager. I was a Practice
11   Manager.
12 Q   Practice manager. And then what followed
13   your being Director of Patient Financial
14   Services?
15 A   Director of Cardiology.
16 Q   Okay. So let's focus in on the time frame
17   from, say, 1997 to the present.
18     What was your title in 1997?
19 A   I believe it was in October of 1997 that I
20   was promoted to Director of Patient Financial
21   Services.
22 Q   And then you remained in that position until
23   2002 when you became the Director of
24   Cardiology?
25 A   Correct.

Page 8

1 Q  Okay.  What does a Director of Patient
2    Financial Services do?
3 A  The Director of Patient Financial Services is
4    responsible for the billing and accounts
5    receivable follow-up for physicians who were
6    employed by the Allegheny Specialty Practice
7    Network.  We were responsible for -- I was
8    responsible for making certain that the
9    claims went out cleanly, that we submitted --
10    that we submitted bills according to the
11    guidelines of the payers.
12 Q  What is the Allegheny Specialty Practice
13    Network?
14 A  It's a group of specialty physicians who are
15    employed -- it's a network of physicians that
16    are specialists who are employed and
17    primarily practice at the Allegheny General
18    Hospital location, but some of them do have
19    satellite locations.
20 Q  So, when one of the physicians in this
21    network issues a bill, then it is billed
22    through Allegheny General Hospital, and
23    that's your function?
24 A  No.
25 Q  No?

Page 9

1 A  That is not my function.  Allegheny General
2    Hospital is a separate corporation from ASPN,
3    from the Allegheny Specialty Practice
4    Network.
5       Allegheny General Hospital bills for the
6    technical component of any service that's
7    supplied by the hospital.  My function was to
8    oversee the billing process of the
9    professional component of the physicians who
10    were employed by Allegheny Specialty Practice
11    Network.
12 Q  Who are you employed by?
13 A  I -- I'm sorry, I don't understand what
14    you're asking me right now.  Now?
15 Q  Your paycheck -- well, okay.
16       Right now, whose name is on your
17    paycheck?
18 A  Allegheny General Hospital.
19 Q  Okay.  Back in '97 whose name was on your
20    paycheck?
21 A  I'm uncertain of who was on my paycheck at
22    that time.
23 Q  Okay.  I'm still trying to figure out the
24    billing services that you provide and for
25    whom do you provide them, and who pays you to

Page 10

1    provide those billing services.
2       So, let's start off with the billing
3    services you provide.  What do you -- what
4    services do you oversee or provide?
5 A  I don't oversee any right now on the billing
6    side.
7 Q  Okay.
8 A  I'm employed by Allegheny General as the
9    Cardiology Director currently.
10 Q  But, in '97, when you were Director of
11    Patient Financial Services, what billing
12    services did you provide?
13 A  In 1997 the -- the billing is a very complex
14    system.  There are multiple information
15    systems that feed into that, and there are
16    multiple inputs of data along the way and
17    edits along the way that result in a final
18    bill that goes to the payers.
19       My responsibility was that once the
20    charge was entered by the front end staff,
21    that that charge was transferred into the
22    billing system, the Signature Billing System
23    that I oversaw.  There was an editing system
24    that was in place as well, so that when the
25    data transferred from the Signature Billing

Page 11

1    System, it was edited by the HDS System to
2    send the claim out in the cleanest possible
3    way.
4       In 1997 I was not overseeing the HDS
5    Billing System, however.
6 Q  So, you indicated that it all -- billings all
7    start when the charges are entered by the
8    front end.
9 A  Um-hum.
10 Q  What do you mean by that phrase?
11 A  I -- I don't believe that that's what I said.
12 Q  Okay.
13 A  The billing process is a really complicated
14    process and there are -- it's multiple input
15    that goes into the billing process, even
16    prior to the charge being entered.
17 Q  Okay.  So, when a charge is entered by the
18    front end, what do you mean by that?
19 A  When the charge is keyed, actually keyed into
20    the system by the data entry person or the
21    billing person from the front end, that
22    information is then transmitted to the
23    Signature Billing System.
24 Q  Okay.  Let's see if we can identify who it is
25    that is submitting these charges to the

Page 12

1    individual who is keying them in.
2        I take it these are doctor's bills;
3    right, or are they hospital bills, or both?
4  A  In 1997 I was not responsible for the front
5    end charge entry process.
6  Q  Okay.
7  A  So what is your question?
8  Q  All right. I'm trying to get an
9    understanding of the overall process. Before
10   we get into your specific duties and
11   responsibilities I want to get the general,
12   overall picture.
13       I take it there are doctor's bills and
14   hospital bills; right?
15 A  That's correct.
16 Q  And the doctor's bills come from the
17   Allegheny Specialist Practice Network; is
18   that right?
19 A  The doctors who provide the information to
20   the biller were employed by Allegheny
21   Specialty Practice Network.
22 Q  Okay. And the hospital bills that provide
23   the information to the biller come from
24   where, Allegheny General?
25 A  The hospital bills were not the

Page 13

1    responsibility of the person who was
2    responsible for the professional component.
3  Q  Okay. So there's two separate billers?
4  A  That's correct.
5  Q  The physician's biller is coming from the
6    Allegheny Specialty Practice Network, goes
7    through one set of billers; is that right?
8  A  That's correct.
9  Q  And then the hospital charges go through a
10   second set of billers?
11 A  That's correct.
12 Q  Okay. Now, the hospital charges, those are
13   Allegheny General Hospital charges; right?
14 A  That's correct.
15 Q  And the physician's charges are the charges
16   of the physicians from the Allegheny
17   Specialty Practice Network?
18 A  That's correct.
19 Q  And after these charges go to their
20   respective billers, what happens then?
21 A  They appropriately code and key the charges
22   into the billing system.
23 Q  Okay. And that's what you're referring to as
24   the Signature System, or something else?
25 A  No. I was not referring to the Signature

Page 14

1    Billing System. It depends on who the biller
2    is, what the process is within that
3    department, and whether they're keying
4    technical charges or professional charges or
5    both.
6  Q  Okay. So, let's start off with the doctor's
7    bills coming from the Allegheny Specialty
8    Practice Network. Those bills go to a key
9    person who keys in the bills; is that right?
10 A  That's correct.
11 Q  And that person keys them in differently
12   whether they're technical charges or doctor's
13   charges; is that right?
14 A  No, that isn't right.
15 Q  Okay. Tell me how it works.
16 A  The person who is keying the charges for the
17   Allegheny Specialty Practice Network is
18   solely entering charges for the professional
19   component in the Cardiology Department.
20 Q  Okay. And they have a computer system that
21   they use to key in these charges?
22 A  Correct.
23 Q  What's the name of that computer system?
24 A  Can you rephrase your question?
25 Q  I'm trying to follow the process of the

Page 15

1    bills, first of all, from the Allegheny
2    Specialty Practice Network --
3  A  Okay.
4  Q  -- and how they're processed. All right?
5        So the physicians from the network
6    provide information to, basically, a keypunch
7    operator, and the keypunch operator puts
8    these into a system. What system does the
9    keypunch operator put them into?
10 A  It could be one -- it could be different
11   systems. One of them is a turnaround
12   document, which is a file that sits between
13   the Envision Billing System, which is the
14   hospital billing system, and the -- and the
15   Professional Fee System, which is the
16   Signature Billing System.
17       Charges could be keyed, either into the
18   turnaround documents, or directly into
19   Signature.
20 Q  Okay. Under what circumstances are they
21   keyed into the turnaround document, and under
22   what circumstances are they keyed into
23   Signature?
24 A  The turnaround document was for charges where
25   there was both a technical and a professional

Page 16

1  fee component to the service. So, if there
2  was a technical charge, in some instances,
3  not all, the charge was mapped into a
4  turnaround document.
5 Q Okay. And under what circumstances are they
6  keyed directly into the Signature?
7 A They're keyed directly into Signature if the
8  technical charge had not been mapped to the
9  turnaround document.
10 Q Are you saying then, that if there's no
11  technical charge and it's just a professional
12  charge, it's keyed directly into the
13  Signature System?
14 A No. What I'm saying is that there is a
15  specific group of technical charges that are
16  mapped to a turnaround document, then it's
17  completed and then sends that file to
18  Signature.
19     In some instances, there is a technical
20  charge by the hospital, but those charges may
21  not be keyed into the Signature System.
22 Q Okay. Are you indicating when the doctor
23  bills are keyed into the turnaround system
24  there are -- there's a provision for
25  technical charges and a provision for

Page 17

1  professional charges.
2     What do you mean by technical charges?
3 A I'm misunderstanding your question. Can you
4  ask that again, please? I'm not sure --
5 Q You indicated that when doctors bills are
6  keyed into the turnaround system there are
7  provisions for technical charges and
8  professional charges. What do you mean by
9  technical charges?
10     MR. JOHNSON: And I'm going to
11  object to the form of the question because I
12  think it misstates the witness's previous
13  testimony.
14     THE WITNESS: Do I answer the
15  question?
16     MR. JOHNSON: If you can.
17     THE WITNESS: Okay. There are no
18  technical charges in the turnaround
19  document. The technical charges do not
20  reside in the turnaround document. The
21  charges that are completed in the turnaround
22  document are professional charges only.
23 BY MR. ERNSBERGER:
24 Q Okay. What is a technical charge?
25 A The technical charge is the hospital's

Page 18

1  component of a service that's been provided
2  to a patient. So it -- it's their costs that
3  are incurred.
4 Q So, an example of the technical charge might
5  be an x-ray or an EKG; is that right?
6 A No, that isn't right. There is both a
7  technical and a professional component to
8  both of those examples.
9 Q Okay. So, as to an EKG, there is a technical
10  charge that the hospital issues a bill for
11  and a professional charge that the doctors
12  issue a bill for?
13 A That's correct.
14 Q Okay. Let's take a factual situation and see
15  if we can trace the billing under this
16  situation: A patient comes into the
17  Allegheny General Emergency Room and has an
18  EKG done. I would presume that there is both
19  technical charges and professional charges.
20     Can you tell me how those charges are
21  processed?
22 A No. I -- I was not the front end person who
23  processed those charges from the beginning,
24  so, no, I can't tell you that.
25 Q So, at some point, after the charges are

Page 19

1  processed in the front end, do you receive
2  that information?
3 A Yes --
4 Q And --
5 A -- in my role in Patient Financial Services I
6  did.
7 Q Right. At what point do you receive the
8  information concerning the technical charges
9  and professional charges of an EKG?
10 A I do not receive the technical charges of an
11  EKG. I received professional charges.
12 Q And, when you receive the professional
13  charges, what do you do with them?
14 A I didn't personally do anything with them. I
15  was the director of that department.
16 Q What did the people you supervise do with
17  them?
18 A When the charges entered the Signature
19  Billing System there was a series of edits.
20  Once that charge was transferred over to the
21  Signature Billing System there was a series
22  of edits that occurred in the HDS Billing
23  System prior to the charge being sent out to
24  the insurance carrier.
25     If the series of edits found that the

Page 20

1 claim was clean, the claim was sent out
2 automatically. If there was an edit that
3 stopped the claim, there was an HDS billing
4 staff member who worked that claim to
5 determine why the claim was stopped and what
6 needed to occur to make that a clean claim.
7 Q Um-hum.
8 A They would frequently call the front end
9 biller and ask them to clarify information,
10 they provided reports to the front end biller
11 to clarify the information. And, once
12 appropriate information was received back
13 from the front end and the claim was
14 corrected, it was sent out to the insurance
15 carriers.
16 The billing staff also worked on denials
17 that came back from the insurance carriers
18 and requested information from the front end
19 billing staff when necessary to appeal any
20 denials that were inappropriate.
21 Q So, is it correct to say that, in general, it
22 is your staff that makes sure that the claim
23 submitted to the insurance carrier is a
24 "clean" claim?
25 A No.

Page 21

1 Q Who is it that insures that a bill sent to an
2 insurance carrier is a clean claim?
3 A It is the front end staff, the physician, and
4 the person who is entering the charge who has
5 the data available to submit the clean claim.
6 Q So what is the responsibility of your staff
7 to make sure that a clean claim is submitted?
8 A Their responsibility is that we've built in
9 some safeguards to check for things that may
10 not be -- that may trigger a question
11 regarding whether it's a clean claim. And
12 their role is to clarify with the front end
13 staff what the appropriate information on
14 that bill is.
15 Q Is it correct to state that your staff must
16 be familiar with what is and what is not a
17 clean claim so that they can do that
18 checking?
19 A It's appropriate that they know some
20 information that would contribute to a clean
21 claim. However, they are not on the front
22 end to know what service was actually
23 provided.
24 Q Do you know whether Medicare has any rules
25 and regulations as to the billing of EKG's in

Page 22

1 both the emergency room and the hospital in
2 patients?
3 A I know what Medicare's regulations are
4 regarding the professional component of EKG
5 interpretation.
6 Q Can you please summarize those for me?
7 A Medicare, to the -- I am paraphrasing my
8 recollection of Medicare's regulations.
9 Medicare expects that the emergency room
10 physician who is doing the interpretation of
11 the EKG performed in the emergency room, and
12 is subsequently treating the patient based on
13 that EKG finding, is the interpreting
14 physician of the EKG.
15 An overread can be performed by a
16 cardiologist and may be billed if additional
17 information is obtained when the cardiologist
18 interprets that EKG and impacts the treatment
19 of that patient.
20 Q Okay. So there are circumstances where
21 Medicare will approve the payment of both the
22 emergency room doctor and the cardiologist
23 interpreting the same data; is that correct?
24 A That's correct; for the time frame that I was
25 Director of Patient Financial Services.

Page 23

1 And those circumstances where Medicare will
2 approve the payment of both the ER doctor and
3 the cardiologist doctor is when the
4 cardiologist doctor finds something in his
5 interpretation that is different and
6 additional to the ER doctor's interpretation?
7 A Not necessarily different, but adds to the
8 value of the interpretation.
9 Q Now, if the cardiologist doctor does not find
10 something that adds to the value of the ER
11 doctor's interpretation, then Medicare
12 prohibits billing by the cardiologist; is
13 that correct?
14 A Yes, that is correct.
15 Q Is there anything that your staff can do to
16 insure that there is no improper double
17 billing for the work of both the ER doctor
18 and the cardiologist?
19 A Which staff are you referring to?
20 Q The staff that you --
21 A And which time period?
22 Q -- supervised.
23 A During what time period?
24 Q Well, we'll start off in the 1997 time
25 period.



Page 24

1    I take it the time period is significant
2    here?
3 A  Well, I was -- was supervising different
4    staff in different roles.
5 Q  Okay.  You help me break down the time
6    periods.  First of all, how should I break
7    them down; is it 1997 to 1998, or is there
8    some other time period that I should be
9    looking to?
10 A  And I would ask you to break down the time
11   period that you -- that you want me to
12   address.
13 Q  Okay.  In the 1997 time period, was there
14   anything that your staff was to do to prevent
15   double billing, improper double billing to
16   Medicare?
17 A  At that time period there were edits that
18   were in the HDS System that would recognize
19   potential duplicate charges, and their role
20   at that time was to review that series of
21   claims that had errored out in the HDS System
22   and delete anything that was a duplicate
23   charge prior to sending it to the payer.
24 Q  Was it also their responsibility to establish
25   the appropriate edit so that the edits would

Page 25

1    find the double billing?
2 A  No.  We went above and beyond by doing that.
3    That was the -- it was the responsibility of
4    the front end staff to correctly enter the
5    number of charges that reflected the service
6    that was provided.
7 Q  Okay.  The front end staff originally enters
8    the charges.  However, your staff does edits;
9    right?
10 A  That's correct.
11 Q  Who creates the edits that your staff uses?
12 A  The edits can be created by multiple people.
13 Q  But -- but --
14 A  Let me back up.  I'm sorry.
15    The edits are recommended by various
16   people within the department --
17 Q  Within your department?
18 A  Within the Patient Financial Services
19   Department.  And, in some instances, in many
20   instances, with consultation from the
21   Compliance Department and with the payers, we
22   submit those edits to the HDS company, which
23   was a third party, to build the edits.
24 Q  Okay.  I think we asked in the 1997 time
25   frame what was the responsibility of your

Page 26

1    staff to insure that there was no double
2    billing of ER bills, or improper double
3    billing.
4    Have you completely answered that
5    question as to the responsibility of your
6    staff in 1997?
7 A  No.  I would say that beyond the actual
8    billing of the claim, if denials came back,
9    they would research the denial and, if
10   appropriate, appeal that claim.  And if they
11   found that there wasn't -- they found that
12   there was an overpayment to Medicare, a
13   request would be made to resubmit payment
14   back to Medicare.
15    However, I do want to restate that it's
16   the responsibility of the front end person
17   who is entering the charge, to enter the
18   correct number of EKG's.  There isn't -- the
19   edits are to -- in an attempt to identify
20   something that's a potential error, but there
21   needs to be input from the front end in order
22   to determine if that's an error or not.
23 Q  You indicated that in addition to your staff
24   doing edits, your staff also responds to
25   denials.

Page 27

1    What is a denial?
2 A  A denial is a response back from a payer with
3    a reason as to why they will not pay that
4    particular claim.
5 Q  So, if I understand you correctly, you're
6    telling me that someone from the front end
7    keys in the data, your staff does edits based
8    on the system programs and determines whether
9    the data keyed in on the front end should be
10   sent on to the payer, such as Medicare.
11    Is that right?
12 A  Not completely.  They verify -- when a
13   question arises, or, if a claim hits an edit,
14   they obtain information from the front end to
15   determine whether that claim should go out
16   the door.
17 Q  Okay.  So your staff is, basically, a
18   doorkeeper, to make sure that the information
19   provided by the front end people is correct
20   and complete, and that billing is appropriate
21   before it is sent out to the insurance
22   provider, such as Medicare?
23    MR. JOHNSON:  Object to the form of
24   the question.
25    MR. ERNSBERGER:  Is that right?

Page 28

1    THE WITNESS:  No, it isn't right.
2  BY MR. ERNSBERGER:
3  Q  Then what service or protection does your
4    staff provide to insure that the bills
5    submitted by the front end are correct when
6    they're submitted to Medicare?
7    MR. JOHNSON:  Object to the form of
8    the question as being asked and answered, at
9    least once, if not twice.
10    THE WITNESS:  Once again, the
11    responsibility of making sure of -- that the
12    charge that's entered is the appropriate
13    charge lies with the front end staff.
14    The back end staff is responsible for
15    reviewing any edits that have been built in
16    as a safeguard.  And if there is a question
17    regarding an edit -- a claim that has edited
18    out in the HDS Billing System, clarification
19    is sought to determine whether that claim
20    should be submitted.
21  BY MR. ERNSBERGER:
22  Q  Now you also indicated that, at times,
23    overpayments are an issue.  Please explain
24    what you mean by that?
25    MR. JOHNSON:  Object to the form of

Page 29

1    the question.
2    THE WITNESS:  There are always
3    instances in billing where the payer may pay
4    a service incorrectly, and when we found that
5    we would submit a request to the Accounts
6    Payable Department to issue a check back to
7    the payer.
8  BY MR. ERNSBERGER:
9  Q  Can you give me an example of an overpayment?
10  A  A payer paying for a service twice.  And when
11    the payment -- the second payment is posted
12    to the account it causes a charge credit in
13    the system.  The biller reviews it and
14    requests the repayment.
15  Q  So, if both the ER doctor and the
16    cardiologist doctor do an interpretation, and
17    both bill, and it's not proper for them to
18    both be paid, then there is an overpayment.
19    Is that what you're saying?
20  A  Yes, I am saying that.
21  Q  Okay.  And if your staff finds that there has
22    been an overpayment, then it is the
23    responsibility of your staff to make a
24    refund; is that right?
25  A  It's their responsibility to request the

Page 30

1    refund from the Accounts Payable Department,
2    if they find it.
3  Q  When they request a request from the Accounts
4    Payable Department, what is then next done to
5    actually make the refund?
6  A  I am not certain of the process within the
7    Accounts Payable Department.
8  Q  So, after your staff finds that an
9    overpayment has been made and has submitted
10    that information to the Accounts Payable
11    Department, the responsibility of your staff
12    is over with; is that correct?
13  A  No, it's not over with.
14  Q  Okay.  Then what is the continuing
15    responsibility of your department if your
16    department finds an overpayment and submits
17    it to the other department?
18  A  They have no further responsibility in
19    regards to following up to see if Accounts
20    Payable paid that back to the payer.
21    They do have responsibility to follow up
22    on the accounts if -- as they appear at their
23    work station.
24  Q  What do you mean by that?
25  A  They follow up on -- they continue to work

Page 31

1    denials as they come back from the insurance
2    carriers; and they continue to work the
3    billing edits.
4  Q  When you say that they have responsibility to
5    follow up on accounts, does that include a
6    responsibility to make sure that it does not
7    happen again?
8  A  No.  That's not their responsibility.
9  Q  If your staff finds that an overpayment has
10    been made, does anyone in your staff have a
11    responsibility to make sure that kind of
12    overpayment does not happen again?
13  A  It's not their personal responsibility to do
14    that.
15  Q  Does anybody have any responsibility to make
16    sure that overpayment does not happen again?
17  A  If the staff sees that there are -- is a
18    pattern of errors, they would notify either
19    myself or one of the analysts within the
20    department to investigate whether there was
21    an issue.
22  Q  And after your staff notifies either you or
23    an analyst to investigate a pattern of
24    overpayments, what do you do?
25  A  I don't recall there ever being any time

Page 32

1  period where there was a pattern of extensive
2  overpayments, at any point in time that I had
3  to investigate, at this time.
4 Q  If a pattern of errors is brought to the
5  attention of an analyst, as opposed to
6  yourself, what does the analyst do?
7 A  I can't speak to what they have done at every
8  point in time. However, they have access to
9  pulling reports, and very frequently would
10  come to me if a question arose that they felt
11  that they could pull a report on, but not
12  related to overpayments. That was not -- I
13  do not recall, at this time, ever being asked
14  to pull a report because of an overpayment,
15  or a pattern of overpayment.
16 Q  Have there -- have you participated in any
17  investigations concerning Medicare billings?
18 A  Can you clarify that?
19 Q  Concerning -- have you participated in any
20  investigation of overpayments by Medicare?
21 A  I have -- I've had individual instances where
22  a biller may have brought an overpayment of a
23  Medicare claim to me and submitted a form to
24  me requesting a repayment.
25 Q  So, to your recollection, you've never

Page 33

1  investigated any pattern of overbilling to
2  Medicare?
3 A  I do not personally recollect conducting an
4  investigation or participating in an
5  investigation regarding Medicare.
6 Q  Now, you've asked me to limit my questions to
7  the 1997 time frame because, apparently,
8  there was something important about that time
9  frame. And so now I have to ask the same
10  questions about 1998.
11      In 1998, did your staff have any
12  responsibility for stopping or identifying
13  double billing?
14 A  They had the responsibility of reviewing any
15  claims that had edited out of the HDS Billing
16  System and obtaining further clarification
17  from the front end staff as to what was
18  appropriate to bill.
19 Q  And did they use edits at that time to
20  identify potential overbilling problems?
21 A  Yes, they did.
22 Q  And, if they found something through an edit,
23  did they follow up with it to insure that
24  there was no double billing?
25 A  They followed up with it in an attempt to

Page 34

1  obtain information from the front end staff
2  as to whether what was in the system was an
3  appropriate bill.
4 Q  Did they ever follow up to make sure that
5  their edits were correctly and fully
6  identifying overbilling?
7 A  Yes.
8 Q  What did they do to insure that their edits
9  were correctly identifying overbilling?
10 A  Before an edit was installed, it was tested.
11  However, the edits were a safeguard after
12  had already been entered from the front end.
13  So, all possible scenarios of what could
14  cause double billing could not be built into
15  an edit, but it was a safeguard to try to
16  correct any human error from the front end.
17 Q  Do you know whether there were any
18  corrections to the editing procedure that
19  were used in 1998?
20 A  There were additions at various points in
21  time, as I recall, and I can't recall
22  specifically. There were many edits in the
23  system.
24 Q  And was it the responsibility of your staff
25  to insure that the edits were the most

Page 35

1  appropriate for identifying overbilling?
2 A  It was the responsibility of my staff to make
3  an attempt at constructing an edit that would
4  potentially correct any errors that occurred
5  on the front end.
6 Q  Do you know whether in 1998 any patterns of
7  overbilling were identified and reported to
8  either you or an analyst?
9 A  I don't recall that at this time. I don't
10  recall any pattern of overbilling.
11 Q  Let's move on to 1999. In that year was your
12  staff responsible for reviewing the bills to
13  make sure that there was no overbilling?
14 A  It was my staff's responsibility to review
15  the HDS edits, the claims that had errored
16  out of the system, and verify with the front
17  end that the claims that had errored were
18  appropriate to bill.
19 Q  And in 1999 was it also your staff's
20  responsibility to establish and maintain the
21  appropriate edits so as to find those errors?
22 A  It was my staff's responsibility to suggest
23  edits that might capture errors that were
24  made by the front end.
25 Q  Do you know whether there was any overbilling



Page 36

1  in 1999?
2  A  I don't recall specific instances of
3     overbilling.
4  Q  Do you also have no recall of any pattern of
5     overbilling?
6  A  No, I don't recall a pattern of overbilling.
7  Q  The year 2000, was it your staff's
8     responsibility to oversee the bills that came
9     in to insure that they were not -- that there
10    was no overbilling?
11 A  No.  It was their responsibility to review
12    the HDS edits to determine if there was a
13    potential error in the billing on the front
14    end staff's part, and to seek clarification
15    when necessary.
16 Q  And was it, again, the responsibility of your
17    department to establish the appropriate HDS
18    edits, or at least recommend them so that
19    they would be established?
20 A  Yes.
21 Q  And, in the year 2000, did you observe any
22    patterns of overbilling?
23 A  No, I did not.
24 Q  In the year 2001, was it still the
25    responsibility of your staff to look for

Page 37

1  overbilling coming through your department?
2  A  It was their responsibility to review the
3     edits and the claims that errored out of the
4     HDS Billing System and seek clarification as
5     to whether it was appropriate to bill the
6     claim.
7  Q  Okay.  In beginning of this series of
8     questions it was important that I specify the
9     time frame.  Okay?  You told me it was
10    important.
11    Why?  Apparently, your answer is the
12    same no matter whether I ask about 1997 or
13    2001.
14    MR. JOHNSON:  Well, I'm going to
15    object to the question because I think the
16    witness was indicating through her response
17    that it was important for her to know what
18    period of time you were questioning her
19    about.
20    And, if I recollect how this transpired,
21    it transpired through you beginning the
22    series of questions by positing to the
23    witness that the witness should tell you what
24    period of time to ask questions about.  So,
25    she simply said, you're the one who should

Page 38

1  identify the time that you want the questions
2  to pertain to, which I think is entirely
3  appropriate.  And I don't think the witness
4  ascribed any particular importance to one
5  year versus another.
6  BY MR. ERNSBERGER:
7  Q  Is your attorney's testimony correct and do
8     you adopt it?
9     MR. JOHNSON:  It's not my
10    testimony, it's my recollection.
11    THE WITNESS:  The only thing that I
12    would add to that is that I was promoted in
13    the fall of 1997 and also had a superior at
14    that time.
15 BY MR. ERNSBERGER:
16 Q  So, in general, the process of billing
17    through your department remained the same
18    from 1997 through 2001?
19 A  No, I would not say that that's true.
20 Q  How has it changed?
21 A  In 1998 my superior left and -- and there was
22    a restructure of the departments, of all of
23    the Finance Department.  So the process was
24    changed at that point in time -- changed at
25    that point in time.

Page 39

1  Q  Was there any point in time when the
2     processing became less effective, the
3     processing of bills and finding
4     overpayments?  Did it become less effective
5     at any time?
6  A  Not to my recollection.  I would say that it
7     became -- that it was very effective.
8  Q  I'd like to show you a document that I will
9     mark as Exhibit No. 1.
10    (Whereupon, Exhibit No. 1 was marked for
11    identification.)
12 BY MR. ERNSBERGER:
13 Q  This is dated July 31, 1998.
14 A  (The witness reviews the document.)
15 Q  Do you see that that's a three-page document?
16 A  I'd like the opportunity to read it.  It is
17    three pages, yes.
18    (The witness reviews the document.)
19    MR. JOHNSON:  Are there additional
20    documents that go with the third page?
21    MR. ERNSBERGER:  I think our
22    Exhibit 2 is going to be additional
23    documents, and there may even be an Exhibit
24    3.
25    MR. JOHNSON:  The reason that I ask

Page 40

1  is that the third page of the document
2  tendered to the witness is entitled at the
3  top Audit Results, but it does not appear to
4  be the complete document.
5       MR. ERNSBERGER:  Well, let's mark
6  the third page as Exhibit No. 2.
7       (Whereupon, Exhibit No. 2 was marked for
8  identification.)
9  BY MR. ERNSBERGER:
10 Q  Directing your attention to Exhibit No. 1,
11    can you tell me what that refers to?  What is
12    it?
13 A  It's a letter from Medicare.
14 Q  And it's from Medicare and addressed to whom?
15 A  Mr. DeFabio, Mr. Louis A. DeFabio.
16 Q  And who is he?
17 A  He was also a Director of Patient Financial
18    Services during this time period.
19 Q  Were you and he both Directors of Patient
20    Financial Services during that time period?
21 A  Yes.
22 Q  Do you know why it was brought to his
23    attention, as opposed to yours?
24 A  Because this area was not my responsibility.
25 Q  Are you familiar with the subject matter of

Page 41

1  that letter?
2  A  No, I'm not.
3  Q  Do you know where Mr. DeFabio is today?
4  A  No, I don't.
5  Q  I take it he is not an employee of Allegheny
6     General, to your knowledge?
7  A  I -- I don't know if he is.
8  Q  Now, after reading that document, do you have
9     an understanding of whether it makes
10    reference to an audit?
11 A  It states that it's regarding an audit
12    result.  In the title it says the audit
13    results.
14 Q  From that document, can you determine what
15    audit results were being discussed?
16 A  Yes.  In paragraph four it identifies the
17    procedure codes that were being audited.
18 Q  And what were the procedure codes being
19    audited?
20 A  99284GC and 99285GC.
21 Q  Does the document describe why those
22    procedure codes are being audited?
23       MR. JOHNSON:  I'm going to
24    object to the series of questions because I
25    think the document, Exhibit No. 1, speaks for

Page 42

1  itself.  I mean, the last --
2       MR. ERNSBERGER:  Your objection is
3  noted.
4       MR. JOHNSON:  -- the last five
5  questions have all just asked the witness to
6  read things from what the exhibit states.
7       MR. ERNSBERGER:  Go ahead and
8  answer the question.
9       THE WITNESS:  Can you please repeat
10    the question?
11 BY MR. ERNSBERGER:
12 Q  Does the document say why those procedure
13    codes are being audited?
14 A  Yes, it does.
15 Q  And what does it say?
16 A  That you were chosen for an audit -- I'm
17    quoting this directly from the document.
18    "You were chosen for a audit because an
19    unusual reporting frequency was identified
20    for procedure code 99284GC, as compared to
21    your peer group."
22 Q  Now, in this audit letter Medicare is talking
23    about a procedure code, 99284GC.  What does
24    that procedure code relate to, to your
25    knowledge?

Page 43

1  A  I would not have known what this procedure
2     code was except that it is identified later
3     in the document.
4  Q  And what is it related to?
5  A  Actually, it's in the Exhibit No. 2 document,
6     99284GC is an Emergency Room Department visit
7     -- and I'm reading this directly from the
8     document -- for the evaluation and management
9     of a patient, which requires these three key
10    components:  A detailed history; a detailed
11    examination; and a medical decision making of
12    moderate complexity.
13       Counseling and/or coordination of care
14    with other providers or agencies are provided
15    consistent with the nature of the problem --
16    problems -- and the patient's and/or family's
17    needs.
18       Usually, the presenting problem/problems
19    are of high severity, and require urgent
20    evaluation by the physician, but do not pose
21    an immediate significant threat to life or
22    physiologic function.
23       MR. JOHNSON:  And, just for the
24    record, that concludes this first page, and
25    we don't have whether there are any

Page 44

1 subsequent pages.
2 BY MR. ERNSBERGER:
3 Q Referring to the audit letter again,
4 Exhibit No. 1, can you tell us what the
5 conclusion of the audit is?
6 A It states in the document -- I'm quoting this
7 -- "These claims and their corresponding
8 medical records were audited with our
9 findings resulting in a potential overpayment
10 of $26,979, which includes an actual
11 overpayment of $1,015.80 for the thirty
12 beneficiaries."
13 Q Can you tell from that document what
14 overpayment is being referred to?
15 A I don't understand what you're asking me.
16 Q What overpayment are they talking about,
17 overpayment for what service?
18 A They're referring to this procedure code,
19 99284GC. It's indicating that there were
20 thirty beneficiaries included in the audit.
21 Q When did this document first come to your
22 attention?
23 A Today.
24 Q Did it come to your attention because I
25 handed it to you, or did somebody else bring

Page 45

1 it to your attention?
2 A Because you handed it to me.
3 Q Do you know whether anything was done by your
4 staff to make sure that the overpayments
5 identified in that audit did not reoccur?
6 A I had no knowledge of this audit, of the
7 overpayment, or of any subsequent changes
8 that occurred.
9 Q Would Mr. DeFabio know whether anything was
10 done to insure that no overpayments would
11 reoccur?
12 MR. JOHNSON: Objection, calling
13 for speculation on the part of the witness.
14 I object to the form of the question.
15 BY MR. ERNSBERGER:
16 Q Have you ever talked to Mr. DeFabio?
17 A I've talked to Mr. DeFabio, but not about
18 this subject.
19 Q So, you're unaware of whether he did anything
20 to prevent these kind of overpayments from
21 reoccurring?
22 A That's true.
23 Q Are you able to tell me what should be done
24 to prevent these kind of overpayments from
25 reoccurring?

Page 46

1 A I'm not able to say that at this point in
2 time, because I don't know what caused it.
3 Q Is it correct to say that in order to keep
4 these overpayments from reoccurring, the
5 cause should be determined?
6 A Certainly.
7 Q Do you know whether Mr. DeFabio or anyone on
8 your staff determined the cause of these
9 overpayments?
10 A No, I do not.
11 Q Would it be appropriate for Mr. DeFabio or
12 someone on your staff to determine the cause
13 of these payments so that they would not
14 reoccur?
15 A Not necessarily.
16 Q Why not?
17 A Because this is an evaluation of management
18 codes and it's not possible for somebody in
19 the billing office to know the extent of the
20 service that we provided to the patient or
21 the documentation that was placed on the
22 chart --
23 Q So, in order to --
24 A -- at the time of billing.
25 Q So, in order to determine the cause, your

Page 47

1 office would have to go to the front end
2 people and ask them. Is that what you're
3 saying?
4 A No, that's not what I'm saying.
5 Q Well, how would your people determine the
6 cause?
7 A It was not the responsibility of the people
8 within that department to determine the
9 cause.
10 Q How would anyone determine the cause of these
11 overbillings so as to prevent them from
12 reoccurring?
13 A I'm not going to speculate on that. That
14 wasn't an area of my responsibility.
15 Q Whose responsibility was it to insure that
16 these overpayments would not reoccur?
17 A I don't know who was in place at that time
18 that would be responsible for that.
19 Q Would Mr. DeFabio be responsible to insure
20 that these kinds of overpayments did not
21 reoccur?
22 A No, he would not be.
23 Q Can you tell me the category of person who
24 would be responsible to make sure that these
25 kinds of overpayments did not reoccur?



**Page 48**

1 A   It would have -- I mean, it's the
2   responsibility of the person who is providing
3   the service to correctly identify the level
4   of services they provided.
5    Documentation can be compared to the
6   level of service provided and an auditor is
7   somebody who would find those type of issues.
8 Q   Can you give me a name of an auditor who
9   would be the kind of person that would be
10   responsible for insuring that this would not
11   reoccur?
12    MR. JOHNSON: Object to the form of
13   the question.
14    THE WITNESS: No, I don't know the
15   name of an auditor that would be responsible
16   for this particular practice.
17 BY MR. ERNSBERGER:
18 Q   Does the hospital have such a person, an
19   auditor, who would be responsible for making
20   sure that this would not reoccur?
21 A   The hospital has a Compliance Department and
22   they do employ auditors.
23 Q   So, someone in the Compliance Department
24   would be responsible for making sure that
25   this kind of overbilling did not reoccur?

**Page 49**

1 A   I don't think that it would be their
2   responsibility to -- it would be their
3   responsibility to educate.
4    It's the responsibility of the person
5   who is providing the service to accurately
6   reflect the level of service that they
7   provided.
8 Q   So, would it be the responsibility of someone
9   in the Compliance Department to educate the
10   billers so that this kind of overpayment
11   would not reoccur?
12 A   I would be speculating as to whether that was
13   their responsibility at that time. I don't
14   know that.
15 Q   Well, who would be responsible for educating
16   the billers so that this kind of overpayment
17   would not reoccur?
18 A   I don't know who was responsible for
19   educating the front end staff.
20 Q   Do you know whether the people responsible
21   for educating the front staff were made aware
22   of this audit?
23 A   I wasn't even aware of the audit, and,
24   therefore, I'm -- I don't know what occurred
25   as subsequent events related to this audit.

**Page 50**

1 Q   Would Mr. DeFabio be the person to make the
2   front end people aware of these audit results
3   so they would not reoccur?
4    MR. JOHNSON: Objection. Improper
5   foundation, it calls for speculation.
6    - THE WITNESS: I don't know.
7 BY MR. ERNSBERGER:
8 Q   Do you know the title of the person who would
9   be responsible to tell the front end staff
10   the nature of this audit so it wouldn't
11   reoccur?
12 A   No, sir, I don't know who was responsible to
13   notify the front end staff of this issue.
14 Q   What is the date of that document again?
15 A   July 31st, 1998.
16 Q   Next I'd like to show you an e-mail from Chet
17   Cornman to Kathy Imhof, the subject is Re:
18   Kathy Deloplaine. And I'll have this marked
19   as Exhibit No. 3.
20    (Whereupon, Exhibit No. 3 was marked for
21   identification.)
22    (The witness reviews the document.)
23    Okay.
24 BY MR. ERNSBERGER:
25 Q   May I see the document?

**Page 51**

1 A   (The witness hands over the document.)
2 Q   Who is Chet Cornman? What position does he
3   hold at AGH?
4 A   He's currently the -- I don't know what his
5   title is. He's employed in the Cancer Center
6   at Allegheny General currently.
7 Q   Now, back in '01, where was he employed?
8 A   He was employed in cardiology at that time,
9   as the Director of Cardiology.
10 Q   And he's writing this memo to Kathy Imhof.
11   Who is Kathy Imhof?
12 A   Kathy Imhof was the administrative secretary
13   within the Division of Cardiology.
14 Q   Now, this EKG [sic] says that the subject
15   matter is, Re: Kathy Deloplaine. Why are
16   you identified as the subject matter of this
17   EKG? Do you know?
18    MR. JOHNSON: Objection. It calls
19   for speculation.
20 BY MR. ERNSBERGER:
21 Q   You don't know?
22 A   No, I don't know.
23 Q   Okay. It says that the problems noted in EKG
24   billing are complex and will be coordinated
25   by Internal Audit, myself, and Kathy

Page 52

1  Deloplaine.
2      Do you know what problems this memo
3  refers to when it says: "The problems noted
4  in EKG billing "
5  A  No, I didn't know at that time.
6  Q  Do you know now what problems are referred to
7      as the problems noted in EKG billing?
8  A  I know that there was a series of meetings
9      that were set up to look at EKG billing.
10 Q  Do you know what problems were being looked
11     at as to EKG billing?
12 A  They were looking -- the subject of that is
13     the double billing of EKG's, potential double
14     billing of EKG's.
15 Q  So, when you're referring to potential double
16     billing of EKG's, are you saying that there
17     is a potential that the EKG's are being
18     billed both in the emergency room and in the
19     Cardiology Department, and that they're not
20     supposed to be billed by both departments to
21     Medicare?
22 A  What I'm saying is that somebody from the
23     front end thought that there was a
24     possibility that the EKG's were being billed
25     -- being double billed.

Page 53

1  Q  Who was it in the front end that suggested
2      the possibility that the EKG's were being
3      double billed?
4  A  I don't know who brought that to Chet
5      Cornman's attention.
6  Q  The next line refers to:  Cindy is setting up
7      a meeting tomorrow.  Who is Cindy?
8  A  She's referring to Cindy Hartman, who is
9      copied on that e-mail.
10 Q  Now, you indicated that there were a number
11     of meetings that were set up and did occur
12     concerning EKG double billing; is that right?
13 A  After that memo.
14 Q  Um-hum.  Do you know who participated in the
15     meetings concerning EKG double billing
16     following this memo?
17 A  I know that some meetings occurred without me
18     being there.  I can only speak to the ones
19     that occurred while I was there.
20 Q  How many meetings occurred while you were
21     there?
22 A  I believe there were three formal meetings.
23 Q  This memo is dated June 19, 2001.  How soon
24     after this memo was written were the three
25     formal meetings done?

Page 54

1  A  I believe the first formal meeting was in, I
2      believe it was in January.
3  Q  This memo is in June.
4  A  Correct.
5  Q  June 19th '01.
6  A  Correct.
7  Q  So, you're indicating that the first formal
8      meeting following the issuance of this memo
9      was in January of '02?
10 A  The first one that I participated in was in
11     January of 2002, to the best of my
12     recollection.
13 Q  And then you indicated that you participated
14     in three formal meetings, and the first one
15     was in January of '02.
16         When was the next one?
17 A  I believe it was later that same month.  It
18     was in the time frame of late January or
19     early February of 2002, but I don't recall
20     the date exactly.
21 Q  Then the third formal meeting in which you
22     participated was; when?
23 A  That occurred in February of 2002.
24 Q  Do you know whether there were any meetings
25     between June 19, 2001 and January of '02 that

Page 55

1      other people participated in and you did not?
2  A  I recall hearing that the meeting with Cindy
3      Hartman and other front end billers occurred,
4      but I don't recall the time frame that I
5      became aware of that.
6  Q  Now, this memo is dated June 19, 2001, and it
7      says that Cindy is setting up a meeting for
8      tomorrow.
9          Is it your understanding that the
10     meeting Cindy set up actually occurred on the
11     next day, June 20th '01?
12 A  I don't know when it occurred.
13 Q  Do you know whether it occurred at or about
14     June 19th or 20th?
15 A  I don't know.
16 Q  Are you aware that a meeting did occur?
17 A  I can't say that with certainty.
18 Q  Why do you think that a meeting did occur at
19     all?
20 A  I don't know why.
21 Q  Now, you indicated that you thought a meeting
22     did occur in which Cindy Hartman
23     participated.  What basis do you have for
24     that thought or belief?
25 A  I am not certain how I came to the conclusion

Page 56

1  that there was a meeting without me present.
2  But, at some point in time, in conversations
3  following that date, I had the understanding
4  that a meeting did occur.
5 Q Now, the memo goes on to say: The problems
6  noted in EKG billing are complex and will be
7  coordinated by Internal Audit, myself, and
8  Kathy Deplaine.
9  When it refers to Internal Audit, what
10  does this refer to?
11 A I'm not certain what Chet was referring to.
12 Q Is there an organization at AGH known a
13  Internal Audit?
14 A I believe there is, but I don't know that for
15  certain.
16 Q And it says: The problems noted with EKG
17  billings will be coordinated by Internal
18  Audit, myself, and Kathy Deplaine.
19  Did you coordinate any meetings with
20  Internal Audit and Chet Cornman?
21 A I coordinated the meetings that began in
22  January.
23 Q Do you know why no meetings were coordinated
24  prior to January?
25 A I don't know that no meetings were

Page 57

1  coordinated prior to January. I only know of
2  the meetings that I coordinated, which were
3  in January.
4 Q Do you know why you didn't coordinate any
5  meetings prior to January?
6 A Yes; because there were other processes that
7  were in place that my component of the EKG
8  billing was to make certain that the
9  professional component, which is the
10  interpretation of the EKG's, my involvement
11  only was related to the professional
12  component of the EKG's.
13  And I verified with Cindy in a
14  conversation that she was receiving the hard
15  copies of every EKG so that she could
16  determine exactly how many EKG's should be
17  billed -- the interpretations should be
18  billed; and that she was separating out the
19  Medicare EKG's from the emergency room, from
20  the other EKG's so that she would know not to
21  bill those, that they would be billed with a
22  zero dollar charge.
23 Q When did you come to this understanding?
24 A What understanding? I'm sorry.
25 Q The one that you just described, that Cindy

Page 58

1  was getting the hard copy of the EKG's and
2  would be taking certain steps after that?
3  When did that -- when did your knowledge
4  that she was doing that come to you?
5 A That had been my recommendation several
6  months prior to the June memo. And in August
7  when -- sometime between the time the memo
8  was issued and, I would say in the summer of
9  that year, I had spoken to Cindy on the phone
10  and confirmed with her her process of
11  entering the charges on the professional
12  components and verifying that she was
13  receiving the hard copies of the EKG's from
14  the hard station and was sorting out the
15  Medicare EKG's from the rest of the EKG
16  interpretations.
17 Q Now, at the beginning of your answer you
18  said, "That was my plan before the June
19  memo." And, perhaps you misspoke, because
20  after your original statement you talked
21  about things that were happening after the
22  June memo.
23  Can you clarify for me when you
24  developed this understanding with Cindy
25  Hartman that she would get hard copies of the

Page 59

1  EKG's? Was it before or after this June
2  memo?
3 A It was before the June memo. For many, many
4  months, probably close to a year at least,
5  she was to be receiving the hard copies, and
6  that was at my recommendation to safeguard
7  any double billing.
8  And, after the June memo, I confirmed
9  with Cindy that she was continuing to follow
10  that process.
11 Q Okay. So many months before this June memo
12  you talked to Cindy Hartman about getting the
13  hard copies of the EKG's so as to prevent
14  double billing?
15 A That's correct.
16 Q How did it come up to your attention many,
17  many months before this June memo that that
18  was an issue?
19 A There were occasional occurrences of EKG
20  denials that were coming back from Medicare
21  stating that it was a duplicate.
22  However, I knew that just because it
23  stated that it was a duplicate charge, didn't
24  necessarily mean that it was truly a
25  duplicate. But putting that process into





Page 60

1  place was a safeguard that the charge was not
2  going in more than one time.
3 Q And the process you put in place was to tell
4  Cindy Hartman to pull the hard copies and do
5  what?
6 A She would sort the EKG's out so that the
7  Medicare EKG overreads that -- of EKG's
8  performed in the Emergency Department would
9  be processed separately and placed in the
10  system as a zero dollar charge.
11 Q Now, when you told Cindy Hartman that she
12  should get these hard copies and process them
13  -- evaluate them and process them separately
14  for emergency room charges, was there any
15  correspondence or e-mail or anything to
16  confirm your instructions?
17 A I don't recall of any formal document or
18  e-mail instructing Cindy, but I spoke to her
19  many times on the phone regarding her billing
20  process.
21 Q Do you have a billing protocol that is
22  written so that people can read the sequence
23  of things that they're supposed to do and
24  follow that sequence?
25 A I was not responsible for the front end

Page 61

1  charge entry --
2 Q Okay. Well --
3 A -- piece of that that -- let me complete the
4  answer on that.
5      There was a formal document as to how to
6  complete the charges and the turnaround
7  document.
8 Q So there is a formal protocol, a list of
9  instructions as to how to handle turnaround
10  documents?
11 A There is a formal document that outlines how
12  the turnaround document works and how to
13  enter the data into that turnaround document.
14 Q And does this formal document say that Cindy
15  Hartman is to get hard copies and compare
16  them with something else to insure that no
17  double billing is made?
18 A No.
19 Q Why do you have a formal document as to some
20  things, but you don't have a formal document
21  as to these other things?
22      MR. JOHNSON: Objection to the form
23  of the question.
24      THE WITNESS: It was not my
25  responsibility to identify -- or to map out

Page 62

1  the process that Cindy follows on the front
2  end, or how she arrived at -- how she
3  received the information and the process that
4  she would follow to get that.
5 BY MR. ERNSBERGER:
6 Q So you would refer to Cindy Hartman as a
7  front end biller, is that -- would that be a
8  proper characterization of her
9  responsibilities?
10 A Yes.
11 Q Okay. And who was supervising Cindy Hartman
12  and her front end billing?
13 A Chet Cornman was the Director of Cardiology
14  at that time.
15 Q Did you talk to Chet Cornman about
16  establishing a formal protocol as to how to
17  get hard copies and make the proper
18  comparison to avoid double billing?
19 A I don't recall specifically talking to Chet
20  Cornman about writing down every item of how
21  you would enter a charge or formalizing my
22  recommendations for improving their accuracy.
23 Q Do you know whether you made that
24  recommendation to Chet Cornman?
25      MR. JOHNSON: Made what

Page 63

1  recommendation?
2 BY MR. ERNSBERGER:
3 Q Was he aware of your recommendation to Cindy
4  Hartman that she pull hard copies and make a
5  comparison?
6 A Chet Cornman would have been aware that she
7  was doing that, at least by the meetings in
8  January, because that was discussed at that
9  point in time, that that safeguard was one of
10  many that was in place to prevent the double
11  billing, and he attended that meeting.
12      I can't recall any specific instances or
13  conversations that I had with Chet, but it's
14  my recollection that he would have known that
15  she was doing that.
16 Q Are you aware of any e-mails or other
17  correspondence to or from Chet Cornman that
18  would tell him that Cindy Hartman is to pull
19  hard copies and make a comparison to avoid
20  overbilling -- double billing?
21 A No, I don't recall any specifically.
22 Q Now, in terms of pulling hard copies, what do
23  you mean by that? What is Cindy Hartman to
24  do to physically pull a hard copy?
25 A She would need to communicate with the staff

## Page 64

1  in the heart station and obtain the printout
2  of the EKG.
3  Q  So what does she do with the printout of the
4  EKG?
5  A  Once again, she would sort the printouts by
6  -- so that the Medicare patients who had a
7  place of service of E, which indicates that
8  the patient's EKG was done in the emergency
9  room, that those would be separated from the
10  rest of the EKG interpretations and entered
11  as a zero dollar charge.
12  Q  Well, this memo of June 19th '01, is this
13  memo a response to your instructions to Cindy
14  Hartman that she should pull these hard
15  copies and make the comparisons?
16      MR. JOHNSON:  Objection.
17      THE WITNESS:  I'm really confused
18  by your question.
19      MR. JOHNSON:  No foundation.  I
20  think the question is inconsistent with the
21  witness's previous testimony.
22  BY MR. ERNSBERGER:
23  Q  This memo that's marked as Deposition
24  Exhibit 3, does it have any connection with
25  your instructions to Cindy Hartman that she

## Page 65

1  pull hard copies and look for overbilling?
2  A  It precipitated me verifying with Cindy that
3  she was following a former process that was
4  in place already.
5  Q  I don't understand your answer.  Could you
6  say that again?
7  A  Can you ask me the question again, because I
8  thought I was answering the question?
9  Q  Does this memo have any connection with your
10  instructions to Cindy Hartman that she pull
11  hard copies and check for double billing?
12  A  I don't know if it has a connection, because
13  I'm not certain what billing issue she was
14  identifying, or the reason that she was
15  calling the meeting at this time, to the best
16  of my recollection.
17  Q  Is it your contention that Cindy Hartman was
18  following your instructions when she,
19  basically, called that meeting identified in
20  that memo?
21  A  No.  It is not my contention that she called
22  that.
23  Q  Is it your contention that Cindy Hartman was
24  following your instructions when she
25  discovered overbilling of EKG's?

## Page 66

1      MR. JOHNSON:  Well, I'm going to
2  object to that as lacking any proper
3  foundation.  And I also object because I
4  think the language used in the question is
5  vague and ambiguous.  I'm not quite sure what
6  you're asking.
7  BY MR. ERNSBERGER:
8  Q  After you told Cindy Hartman to get hard
9  copies and look for double billing, did she
10  give ever get back to you?
11  A  My instruction was not to look for double
12  billings, because there would not have been
13  billing on the Pro-Fee side at that time.
14      My instruction to her was, in order to
15  safeguard against incorrectly entering the
16  charges and her entering duplicate charges,
17  that her safeguard was to obtain the hard
18  copies so that she was certain of the number
19  of EKG's that were actually done, and that
20  she sort out the Medicare Emergency Room
21  patients from the rest of the population.
22  Q  After you gave her those instructions prior
23  to June of '01, did she get back to you?
24  A  I don't recall specific conversations with
25  Cindy that indicated that she was doing

## Page 67

1  this.
2      However, she was -- she had specific
3  conversations with my staff member, who was a
4  team leader, and indicated that she was
5  pulling the hard copies.
6      And, ultimately, those hard copies began
7  to come over to our billing department so
8  that we could further verify that -- or so
9  that we would have another mechanism of edit
10  when we were doing accounts receivable
11  follow-up.
12  Q  Okay.  Who was the member of your staff that
13  she confirmed this with?
14  A  I'm saying that she had conversations with my
15  team leader, who is Mary Beth Hietsch.
16  Q  May I see Exhibit 3 again?
17      (Mr. Ernsberger reviews the exhibit.)
18      Now, you make a reference to Mary Beth
19  Hietsch, are you referring to the same Mary
20  Beth that appears on this document?
21  A  Yes.  Mary Beth Hughes is her maiden name.
22  Q  So, after you told Cindy Hartman that she
23  should pull the hard copies and check for
24  this kind of billing, double billing, this
25  memo was issued which is marked Exhibit 3.

Page 68

1    Now, in this memo it says that Cindy is
2  setting up a meeting for tomorrow, and I
3  think ED people -- I think ED people
4  about EKG billing in the -- stopped by --
5  Cindy has set up a meeting.
6    Can you tell me what this is all about?
7    MR. JOHNSON: I'm sorry?
8    MR. ERNSBERGER: This is
9  incomprehensible to me. Can you help
10  interpret what that means?
11    MR. JOHNSON: I have no idea what
12  your question is at this point. What are you
13  asking the witness?
14  BY MR. ERNSBERGER:
15  Q  The question is: Can you tell me what's
16  going on in this memo, your interpretation of
17  what it says?
18  A  I didn't write this memo.
19  Q  Okay. Well, still your interpretation of
20  what it means.
21    MR. JOHNSON: Objection, calling
22  for speculation.
23    MR. ERNSBERGER: I'm asking you for
24  your interpretation, there's is no
25  speculation in that.

Page 69

1    MR. JOHNSON: Well, there is.
2  You're asking for her speculation.
3  BY MR. ERNSBERGER:
4  Q  Tell me what you understand from that memo.
5  A  I understand that Chet Cornman received an
6  e-mail from Kathy Imhof stating that Cindy
7  was calling a meeting regarding the EKG
8  billing. And Chet was indicating that the
9  EKG billing is very complex and that the
10  meeting needed to be coordinated by somebody
11  other than Cindy.
12  Q  Instead of Cindy coordinating it, it was to
13  be coordinated by Internal Audit, Chet
14  Cornman and yourself. Is that a correct
15  interpretation of that document?
16  A  It's a correct interpretation of what Chet is
17  stating in his memo.
18  Q  Did you have any objection to Cindy calling a
19  meeting concerning overbilling?
20  A  Yes, I did.
21  Q  What objection did you have to Cindy calling
22  a meeting concerning overbilling?
23  A  Cindy did not have the expertise to handle a
24  meeting regarding EKG billing. And my
25  objection was that she was not the person to

Page 70

1  solve a problem if, indeed, a problem
2  existed.
3  Q  Did you tell her that it was not her place to
4  call a meeting?
5  A  I told Chet Cornman that it was not her place
6  to call a meeting regarding EKG billing, that
7  it was too complex, and the right people
8  needed to be in the room to determine whether
9  there was a problem and how to solve it if
10  there was.
11  Q  So, the people responsible for solving this
12  problem was not Cindy Hartman, it would then
13  be the Internal Audit, Chet Cornman and
14  yourself?
15  A  No. It would be multiple -- we would need
16  the input of multiple people to determine if
17  there was a problem, and, if there was, to
18  come up with a solution to that problem. It
19  wasn't isolated to Cindy.
20  Q  Now, at the end of this memo it says: Kathy
21  does not think Cindy is the one to do this (I
22  obviously agree). Mary Beth Hughes told
23  Kathy.
24    What is your understanding of that
25  sentence? What did Mary Beth Hughes tell

Page 71

1  Kathy?
2  A  Can I see that again, please?
3  Q  (Mr. Ernsberger hands over the document.)
4  A  I think it's simply stating that Mary Beth
5  Hughes was the person who told me that Cindy
6  was coordinating a meeting.
7  Q  Okay. I've been looking through the
8  collection of documents received in this case
9  and I'm unable to find any documents that
10  describe a follow-up to this June 19th '01
11  memo prior to January 10th '02, like six
12  months later. There's a gap of six months.
13  And I don't see any documents that fill that
14  gap.
15    Are aware of any documents that fill
16  that gap?
17    MR. JOHNSON: Object to the form of
18  the question.
19    THE WITNESS: Can you please
20  rephrase that for me?
21  BY MR. ERNSBERGER:
22  Q  In looking through the documents I've
23  received from counsel, I don't see any
24  documents that refer to EKG double billing
25  from June 19th '01 to January 10th '02.



## Page 72

1  Are you aware of any documents that
2  discuss EKG overbilling between that period
3  of time?
4 A  I'm not aware of any documents that use the
5  term EKG overbilling.
6 Q  I don't see -- looking through the documents
7  provided by defense counsel, I don't see any
8  documents that relate to the subject of this
9  memo in Deposition Exhibit No. 3 for the
10  period of time from November 19th '01 to
11  January 10th '02.
12  Are you aware of any documents that
13  relate to the subject matter of this memo?
14  MR. JOHNSON: I object to the form
15  of the question. I don't believe that it's
16  proper, in the context of the question, for
17  you to offer your evaluation of the thousands
18  of pages of discovery that have been
19  produced.
20  You can certainly ask this witness any
21  question regarding her own knowledge, but
22  please don't put in, as part of the question,
23  your evaluation of the discovery.
24 BY MR. ERNSBERGER:
25 Q  Are you aware of any documents concerning the

## Page 73

1  subject matter of EKG billing, as addressed
2  in this memo, between the dates January 19th
3  '01 and -- I'm sorry, June 19th '01 and
4  January 10th '02?
5 A  The only thing that I can think of is that
6  there is an e-mail that refers to the fact
7  that the MUSE System, which I requested, be
8  installed into the Pro-Fee Billing Accounts
9  Receivable follow-up area; that that system
10  had finally been installed, at my request, so
11  that the back office billing staff would be
12  able to see the printout of the EKG's that
13  had been entered -- that had been performed,
14  I'm sorry.
15 Q  Okay. You're saying that at your request
16  someone was to be given access to the MUSE
17  System.
18  What are you talking about?
19 A  The MUSE System is an EKG management system
20  in which you can view the image of the EKG
21  that was performed on the patient.
22 Q  And when did you make the request that
23  someone have access to the MUSE System?
24 A  I don't recall the first time that I
25  requested it, but it was sometime in early

## Page 74

1  2001.
2 Q  And who did you want to have access to the
3  MUSE System?
4 A  The back office staff and, specifically, Mary
5  Beth Hughes.
6 Q  And you wanted Mary Beth Hughes and her back
7  office staff to have access to the MUSE
8  System for what reason?
9 A  So that if there was an HDS edit that stopped
10  the claim from going out the door, that
11  identified it -- identified the claim as an
12  emergency room patient who was Medicare and
13  had an overread by one of the
14  electrophysiology physicians, that she would
15  be able to look into the MUSE System and see
16  if there was an EKG that was appropriate to
17  be billed by the electrophysiology
18  physicians. She would be able to view the
19  number of EKG's that had been performed.
20  Let me rephrase that. She would be able
21  to look at the actual EKG strips.
22 Q  Was your request that this back office person
23  be able to see the MUSE information intended
24  to prevent double billing or overbilling from
25  the ER?

## Page 75

1 A  It was intended to be one of a series of many
2  edits in a complex system that would identify
3  possible incorrect keying of the charges from
4  the front end staff.
5 Q  So this is one of many possible edits. Was
6  your instruction to Cindy Hartman that she
7  get hard copies a second possible edit? Was
8  this a coordinated effort?
9 A  Yes.
10 Q  So the --
11 A  The hard copies from Cindy preceded the MUSE
12  System being available to the back office
13  staff.
14 Q  Okay. So, you recognized that there was a
15  problem, or, a potential problem, with double
16  billing in the emergency room. And the steps
17  you took were, first, to tell Cindy to look
18  at the hard copies, and, second, to establish
19  access to the MUSE System by the back office
20  staff?
21 A  I recognized the potential of -- that Cindy
22  could incorrectly enter a second charge. And
23  my recommendation to her, to prevent her from
24  doing that, was to obtain the hard copies of
25  the EKG's to prevent her from entering a



Page 76

1 second charge when it was not appropriate.
2 Q And was that one step toward a coordinated
3 effort to avoid double billing, the second
4 step being this connection with the MUSE
5 System, or is there no connection at all?
6      MR. JOHNSON: I'm going to object
7 to the form of the question.
8      THE WITNESS: There were multiple
9 steps that were taken besides what Cindy was
10 doing. And, as I stated earlier, we built in
11 editing systems within the HDS System.
12 BY MR. ERNSBERGER:
13 Q Okay. What were the multiple steps used to
14 avoid double billing? Cindy Hartman looking
15 at the hard copy is one of the multiple
16 steps. What are the others?
17 A Once again, HDS edits were built in to stop
18 the claim once she had already entered the
19 charge that could potentially be double
20 billing. Another step was the MUSE System
21 was available to the back office staff.
22      Prior to the MUSE being installed in the
23 back office staff, Cindy was sending the hard
24 copies that she had been using to the back
25 office to verify the number of EKG's.

Page 77

1 Q So, was it Cindy's job to obtain the hard
2 copies and send them to the back office for
3 verification, or was it her job to obtain the
4 hard copies, verify it herself, and then send
5 it to the back office for their verification?
6 A It was Cindy's responsibility to make sure
7 that she was entering the number of charges
8 that were a correct reflection of the
9 services that were provided on the front
10 end.
11      It was my recommendation that she use
12 the hard copy to insure that that's what she
13 was doing. And, as a next step, she was
14 sending the hard copies that she had reviewed
15 to the back office staff so that it would
16 also be available to them.
17 Q Now you've indicated these multiple steps
18 that were put in place to stop double billing
19 of emergency room charges. Were they put in
20 place before or after this June 19th '01 memo
21 marked as Deposition Exhibit No. 3?
22 A There were many things that were in place, as
23 I stated earlier, to catch potentially
24 incorrect claims that may have been entered
25 by the front end staff. And -- I'm sorry.

Page 78

1 Q So the directions to Cindy Hartman to get a
2 hard copy, I take it that was before this
3 June memo?
4 A Yes, it was.
5 Q Okay. The HDS edits that were made, were
6 they before or after this June memo?
7 A Installing HDS edits was an ongoing thing
8 that occurred within the Patient Financial
9 Services Department, and there were many
10 edits in place prior, and some after the
11 memo.
12 Q Okay. Edits pertaining to double billing
13 from the emergency room?
14 A Edits pertaining to charge entry, incorrect
15 charge entry from the front end.
16 Q Okay.
17 A At that point in HDS they had not been billed
18 out to payers.
19 Q Now, the MUSE System, and making it available
20 to the back staff, was that before or after
21 this June memo?
22 A The request was prior. The installation was
23 after, to the best of my recollection.
24 Q And your instructions to Cindy Hartman for
25 her to send hard copies to the back office

Page 79

1 staff, was that before or after this June
2 memo?
3 A I don't recall being the person who requested
4 that. She and Mary Beth Hietsch coordinated
5 the sending of those back and forth.
6      MR. ERNSBERGER: It's noon, do you
7 want to take a break for lunch or do you want
8 to take a ten-minute break or what?
9      (Whereupon, a short break was taken at
10 12:00 for lunch.)
11 BY MR. ERNSBERGER:
12 Q Good afternoon. I would like to direct your
13 attention to the next exhibit. We'll mark
14 that Exhibit No. 4.
15      (Whereupon, Exhibit No. 4 was marked for
16 identification.)
17 BY MR. ERNSBERGER:
18 Q I think we've already talked about this one
19 briefly, it's the memo of January 10, 2002.
20 A (The witness reviews the document.)
21 Q Are you the author of some part of that
22 e-mail?
23 A I am.
24 Q Can I see it? Now, there is a reference to
25 the MUSE System. Is that what we were



Page 80

```
1    talking about earlier today, a computer
2    system that allows the back room to see
3    what's going on?
4  A We did talk about the MUSE System, which is
5    an EKG management system that's typically
6    used by the front end. And, yes, we -- I
7    requested that it be installed in the back
8    office.
9  Q And does this memo indicate that it was
10   installed in the back office?
11 A Yes, it does.
12 Q And following the installation of the MUSE
13   System, was it your conclusion that,"I think
14   it is apparent that we are billing the
15   overread of Medicare EKG's that were billed
16   out to the ED by the ED doctors."
17       Was that your conclusion based on the --
18   what you found through the MUSE System?
19 A My conclusion was that when -- when the
20   biller on the back end was reviewing claims
21   that edited out of the HDS System, and went
22   back into the MUSE System to verify the
23   number of EKG's that were actually in the
24   system, that there was more than there should
25   have been that came across and hit the edits.
```

Page 81

```
1  Q Now, you indicated in this memo that, "This
2    is something that we were cited for a few
3    years back."
4        What are you referring to there?
5  A I'm referring to my knowledge that prior to
6    my assuming my position in Patient Financial
7    Services as the director there, that Medicare
8    had performed an audit and that we had to pay
9    back monies for overreads by cardiologists of
10   the emergency room physicians' EKG reads.
11 Q Can you look at Exhibit No. 1 and tell me
12   whether that is the audit that occurred a few
13   years back?
14 A This audit occurred in 1998 and does not
15   reference the ER EKG's.
16 Q So that the audit that you're referring to in
17   this, Deposition Exhibit No. 4, that audit is
18   not the same as Exhibit 1?
19 A No, it's not.
20 Q How would I find the audit that you're
21   referring to in Exhibit 4?
22 A I don't know how you would find that.
23 Q Who would I ask within the administration of
24   AGH to find it?
25 A I'm not certain who you would ask. But my
```

Page 82

```
1    understanding is that Compliance would have
2    -- the Compliance Department, during the
3    time that the audit was performed, would have
4    had some knowledge of that and the record of
5    that.
6  Q Okay. If I were to ask your Compliance
7    Department for the audit that you're
8    referring to here, what words should I use to
9    make the request, to properly request it?
10 A I guess I would ask for ask -- ask if they
11   had in their possession any Medicare audits
12   referencing emergency room EKG overreads.
13 Q When you make a reference to "a few years
14   back," you indicated that was before your
15   time.
16       How long before your time?  Do you know?
17 A I'm referencing a time before I was in a
18   position where I would have had
19   responsibility for that, or had personal
20   knowledge of what was contained in the
21   documents or in the audit.
22 Q Okay. When you say a "few years back," how
23   many is a few?  Do you know?
24 A It was prior to my -- it was either 1997 or
25   prior to that, to the best of my
```

Page 83

```
1    recollection.  I don't recall the exact date.
2  Q What do you recall of that prior audit that
3    AGH was cited for a few years back?
4  A The only thing that I recall is conversations
5    that occurred with the previous
6    administration of Patient Financial Services
7    that there had been an audit of the emergency
8    room.
9  Q So, who did you talk to in the previous
10   administration?
11 A My former boss, Cynthia Malecia (phonetic).
12 Q So, she might -- would she have a better
13   understanding of the audit that was done a
14   few years back?
15 A I can only -- that would be speculation,
16   but --
17 Q She's the one that told you about it?
18 A Yes.
19 Q Do you know where she is today?
20 A No, I don't.
21 Q After this particular memo was written you
22   indicated that there were several meetings
23   that you participated in; is that right?
24 A There were three meetings that I recall.
25 Q Yes.  And over what period of time did those
```



Page 84

1  meetings take place? Was it a matter of
2  weeks or months or longer?
3 A  The first meeting occurred at the end of
4  January, as I stated earlier. The next
5  meeting occurred a couple of weeks later, and
6  I don't recall if that was the end of January
7  of 2002 or the beginning of February. And
8  the third meeting occurred in February.
9 Q  Okay. And, after the third meeting, was
10  there any resolution of this issue of how to
11  stop these over-billings?
12 A  There were -- there was no conclusive
13  evidence that there was any double billing
14  that was occurring on a regular basis. And,
15  what we did find, we corrected at that time.
16 Q  When you indicate that you -- what you did
17  find, you corrected, does that mean that you
18  submitted a form to Medicare telling them
19  that you want to make a refund?
20  What do you mean when you say what you
21  found, you corrected?
22 A  What we found we -- what we found in this --
23  at this time was that one of the physicians
24  who was -- one of the cardiologists who was
25  doing the over-read was not included on the

Page 85

1  edit, and he rarely did interpretations. It
2  was a very small volume and so there was no
3  pattern. We made a change to the edit that
4  would stop the claim that had already been
5  entered by the front end billing staff, so we
6  fine tuned the edit that was in place to stop
7  that.
8  To further answer your question the --
9  any billings that we found that were -- where
10  we had been paid, we reimbursed those
11  billings. And I just might add that this
12  spanned over a period of time where I
13  transitioned in my practice, so I don't know
14  what happened at the end of that point in
15  time.
16 Q  Now, in terms of making a refund, what do you
17  know about a refund being made? Was it just
18  one or two, or was it ten, the time frame,
19  anything you can tell me about the refund
20  being made?
21 A  On this particular audit there were only --
22  there were -- I don't recall exactly, but I
23  would say there were ten to fifteen cases
24  that we looked at, so there were very few
25  cases. And none of those -- I'm sorry, I

Page 86

1  believe there was one that had been paid to
2  both the emergency room and to the
3  electrophysiology physician as well. And, to
4  my knowledge, that was refunded after the
5  audit process.
6 Q  Refunded, meaning a check was sent to
7  Medicare to reimburse Medicare?
8 A  Correct.
9 Q  When a sample study is done of, say ten or
10  fifteen cases, and one is found, that
11  suggests that one out of every fifteen have a
12  problem.
13  Was any statistical analysis done to
14  determine the total scope of the problem, as
15  opposed to just a problem within those
16  fifteen cases?
17  MR. JOHNSON: I'm going to object
18  to the form of the question. I don't have
19  any trouble with you asking her the question
20  directly, but please don't preface it with
21  your statement as to what it does or does not
22  suggest. So, please ask her the question
23  directly if you're going to ask --
24 BY MR. ERNSBERGER:
25 Q  Was anything done to determine the total

Page 87

1  scope of the problem, as opposed to just
2  looking at these fifteen cases?
3 A  Yes.
4 Q  What was done?
5 A  I engaged the Compliance Department to expand
6  the audit, which I had already requested,
7  regarding all of cardiology billing.
8 Q  You indicated you had already requested an
9  audit. What do you mean by that?
10 A  I found billing irregularities with the
11  cardiology billing related to Nuclear
12  Cardiology that showed a significant number
13  of bills that had been deleted from the
14  system. And I had audited two months' worth
15  of billing for the Nuclear Cardiology
16  Department, and when I found that there were
17  a significant number of issues related to the
18  billing in that department, I expanded the
19  audit so that we could identify any other
20  issues that existed related to cardiology
21  billing.
22 Q  So that audit concerning deleted bills was
23  expanded to include this issue of ER EKG's,
24  and both of them were referred to Compliance?
25 A  Yes.



Page 88

1 Q Now, the audit relating to deleted bills,
2    I've heard it said that Cindy Hartman had
3    deleted bills. Is that the same thing or
4    something different?
5 A I'm not certain what you're asking me. Can
6    you --
7 Q Okay. There is something -- can you tell me
8    what you mean by an audit of deleted bills in
9    Nuclear Cardiology?
10 A I went back. I recognized that the financial
11    statements did not match the operational
12    volume of that department during November and
13    December of 2001 and I pulled some reports to
14    identify the patients that -- who's bills had
15    been submitted, and compared that to the
16    schedule of the department and found that
17    there were many charges that had not been
18    entered and were not showing up in the
19    billing system.
20      And so to further drill down to find out
21    what the issue was, I requested the Financial
22    Audit Report, which would identify what
23    occurred in the turnaround document. And, in
24    reviewing the turnaround document for the
25    same time period compared to the charges that

Page 89

1    were -- had been entered into the billing
2    system, I identified that charges had been
3    deleted that should have been entered and
4    charged out to the insurance carrier, for
5    Nuclear Cardiology specifically.
6 Q Were you able to determine who it was that
7    deleted the charges?
8 A Cindy Hartman. Yes.
9 Q And who was it?
10 A Cindy Hartman.
11 Q And so the audit of the deleted charges made
12    by Cindy Hartman was combined with the audit
13    of the ER EKG's and sent to the compliance
14    people?
15 A No, sir. That's not correct.
16 Q Okay. Then tell me what happened.
17 A I performed the -- myself and some of my
18    staff performed the audit for the
19    November/December time period related to
20    Nuclear Cardiology charges.
21      When I realized that there were
22    significant discrepancies in Nuclear
23    Cardiology, and that Cindy Hartman was the
24    only biller responsible for the professional
25    component charge entry for all of cardiology,

Page 90

1    I recognized that there was a significant
2    risk that there may be some additional
3    problems with cardiology billing. So I
4    expanded the audit and requested that the
5    Compliance Department become involved and
6    conduct audits of the other cardiology
7    departments.
8 Q Was it your intention that the ER EKG's be
9    included in that expanded audit?
10 A All EKG's, not just ER EKG's were a part of
11    that audit.
12 Q And, when you informed Compliance that this
13    expanded audit should take place, were there
14    memos back and forth between you and
15    Compliance about the current audit you had
16    done and what expansion you think should be
17    done?
18 A I don't recall if there were memos. There
19    were --
20 Q E-mail?
21 A I'm not certain of that either. At the time
22    that I placed Cindy on suspension I notified
23    the Compliance Department that I was doing
24    that, and the reason that I was placing her
25    on suspension, and that I felt that we needed

Page 91

1    to take a look at, not only Nuclear
2    Cardiology, but the other cardiology areas.
3      And that's my recollection at this
4    point. I don't recall any memos.
5 Q Do you know whether the Compliance Department
6    made their own memos of your referral of this
7    matter to them?
8 A I don't know if they did or not. I wasn't
9    -- I was in receipt of requests for
10    information so that they could conduct their
11    audit, information regarding schedules of
12    patients, log books of patients who had had
13    procedures performed, and the results of
14    those audits I received.
15 Q Was it your intention though, that the
16    deleted bills by Cindy Hartman be audited by
17    Compliance at the same time that the ER EKG
18    bills be audited by Compliance?
19 A It was not my intention that they would be
20    done simultaneously, because the job would be
21    too large. It would have to be done in
22    stages.
23 Q Do you know whether it was done, the audit of
24    both Cindy Hartman's deletions and the ER
25    EKG's?



Page 92

1 A  Can you clarify what you're asking me?
2 Q  Did Compliance proceed with your
3     recommendation and do an audit of both Cindy
4     Hartman's deletions and the ER EKG's?
5 A  The Compliance Department completed an audit
6     of Nuclear Cardiology. They expanded the
7     audit that I had done to extend to other
8     months, they then moved on to look at the
9     Echo Cardiology Department. And when I say
10    that they expanded their audit, they looked
11    at many factors, including deletions of
12    charges in those departments as well.
13        And they also did expand their audit to
14    the emergency -- EKG's in general, and
15    that audit also included deletions, charges
16    that were actually entered, etcetera.
17 Q  So, based on your recommendation, there was
18    then a series of audits done; one of the
19    Nuclear Cardiology, another one of Echo
20    Cardiology, and then others of the EKG's.
21        Is that a correct understanding?
22 A  Yes, that is a correct understanding.
23 Q  Was there a sequence of which one came first
24    and which one came second and which one came
25    third?

Page 93

1 A  The sequence of my knowledge of when they
2     occurred, but I don't know when they
3     physically performed the audits.
4        I was aware that the Nuclear Cardiology
5     audit was completed for -- Nuclear Cardiology
6     was completed for the rest of -- for several
7     months that I had not audited personally.
8     And non-invasive labs, which is Echo
9     Cardiology, was next. And, I believe
10    Electrophysiology, which included EKG
11    interpretations, was third.
12 Q  Approximately when were you aware of the
13    completion of each? Were they within days of
14    one another or years? How did they go?
15 A  It was an extensive audit that expanded over
16    a several-month period of time.
17 Q  So, all three of these audits were completed
18    within several months?
19 A  I don't have a complete recollection of when
20    they were completed. And I wasn't performing
21    the audit, so I'm not certain of the time
22    frame between the reports that came back to
23    me and the reports that -- and when they
24    actually completed their audit.
25 Q  Approximately when did the Nuclear Cardiology

Page 94

1     audit come to your attention as being
2     completed?
3 A  I don't recall that specifically. However, I
4     had already done an extensive audit on my own
5     and was aware of billing irregularities
6     already too, which spurred us on additional
7     audits.
8 Q  Okay. And how long after the Nuclear
9     Cardiology audit did the Echo Cardiology
10    audit come to your attention as being
11    completed?
12 A  I don't recall exactly, but I believe it was
13    somewhere in the vicinity of May of 2001.
14 Q  And how long after the Echo Cardiology audit
15    did the EKG audit come to your attention as
16    being completed?
17 A  I don't recall that. EKG had a much greater
18    volume than any of the other cardiology
19    departments and it took much longer than the
20    other areas. And it was not solely emergency
21    room EKG's, it was all EKG interpretations,
22    which included the entire inpatient units,
23    other outpatient EKG's done in other areas
24    besides the emergency room, and the emergency
25    room.

Page 95

1 Q  But all of these audits were done by
2     Compliance rather than yourself?
3 A  That's correct.
4 Q  Now, going back to the audit that you did
5     yourself, what documentation did you have to
6     record the audit that you did of Nuclear
7     Cardiology?
8 A  There was a document that was created, and I
9     don't recall if it was myself who created it
10    or one of my staff members, but it was a
11    document that showed a comparison of what was
12    entered into the Signature Billing System,
13    what had been deleted from the turnaround
14    document, whether technical charges had been
15    entered by the hospital billing staff into a
16    spreadsheet.
17 Q  Roughly, what was the date of that
18    spreadsheet that you or your staff created?
19 A  We began the audit in February. And, at the
20    time of Cindy's suspension, a portion of that
21    spreadsheet had been completed, but I
22    requested additional documentation from the
23    hospital billing side to prove whether or not
24    there were technical charges that had also
25    been entered for those services.



Page 96

1 Q So, the professional part of the spreadsheet
2 had been completed, but the technical side
3 had not been completed by the time of Cindy's
4 suspension?
5 A That's correct.
6 Q Now you indicated that the resultant document
7 of your audit was a spreadsheet?
8 A Can I please clarify?
9 Q Sure.
10 A That was the document -- that was one of the
11 documents that I created, or that my
12 department created. However, there were
13 system reports that backed that up as well,
14 that we ran and kept with that audit.
15 Q Okay. That audit, was it in a folder or in
16 an envelope or some -- how is it retained,
17 that audit?
18 A (No response.)
19 Q If I were to look for it, what would I call
20 it?
21 A We've provided that audit to you.
22 Q Okay. When I look at it, what will tell me
23 it is the audit I am interested in?
24 A I don't recall what the title of the
25 spreadsheet is, but there is a title there

Page 97

1 indicating that it's an audit of November and
2 December of 2001, and that it was
3 performed -- who looked into the system, who
4 assisted in performing the audit.
5 Q Okay. Do you know whether that audit is in
6 this stack that I got this morning, or do you
7 know whether it was provided at a different
8 time?
9 A I -- I'm not certain whether that was
10 provided this morning.
11 Q Okay.
12 A Yes. Okay. Yes, it's in the stack that you
13 have.
14 Q This morning?
15 A Yes.
16 Q Okay.
17     MR. JOHNSON: It may or may not
18 have been in earlier documents as well.
19     MR. ERNSBERGER: Okay.
20 BY MR. ERNSBERGER:
21 Q In addition to the audit spreadsheet and the
22 other reports, what else should I look to
23 concerning that audit? Are there any other
24 documents?
25 A Cindy's suspension and ultimate termination

Page 98

1 paperwork references that audit.
2 Q Okay. Are there documents from you to
3 Compliance telling them of the existence of
4 this -- of your audit and its conclusions?
5 A I had -- I don't know if there were
6 documents. I don't recall if there were
7 documents, but I made Compliance aware of my
8 findings, and that was the reason for the
9 expansion of the audit by the Compliance
10 Department.
11 Q In your audit that you did, do you describe
12 how you found out about the Nuclear
13 Cardiology deleted bills?
14 A I created an internal memo to myself
15 outlining the steps that I had taken in how
16 -- you know, what occurred to lead me to
17 believe that these charges had not been
18 billed and what steps I had taken.
19 Q Okay.
20 A There was no document created. It was -- it
21 was an internal document. And then Cindy's
22 suspension papers are the only ones that I
23 can recall.
24 Q The internal document that you created for
25 your own use, is it in this stack that was

Page 99

1 delivered this morning?
2 A Yes.
3 Q Okay. Now, in that internal document do
4 you -- what do you say is -- how did you
5 discover that Cindy had deleted Nuclear
6 Cardiology bills?
7     MR. JOHNSON: Are those two
8 separate questions?
9 BY MR. ERNSBERGER:
10 Q How did you discover it, that Cindy had
11 deleted Nuclear Cardiology bills?
12 A In January of 2002 I reviewed the financial
13 statements for cardiology, for all of
14 cardiology, because Cindy had been out on a
15 leave of absence and there was heightened
16 awareness.
17     It was something that I always audited,
18 or always reviewed anyway, but because Cindy
19 was the sole biller in cardiology that was
20 responsible for professional fee charges, and
21 she had been out on a leave of absence, there
22 was much more scrutiny of the financial
23 documents.
24     And, in January, when I reviewed those
25 documents, after Cindy had told me on

Page 100

1   multiple occasions at the end of December
2   after her return from leave of absence that
3   all charges were in, the financial statements
4   did not match the operational volume. That
5   led me to look further into that and
6   investigate what had occurred.
7 Q Did Cindy ever tell you that there were --
8   that she had any trouble with those billings,
9   like, she was uncertain as to whether she
10  should make deletions or should not make
11  deletions?
12 A Cindy never stated that she was uncertain
13  about what -- about deletions.
14 Q Did anybody tell you that Cindy was uncertain
15  about whether she should or should not make
16  deletions?
17 A No, nobody told me that Cindy was uncertain.
18 Q Now, her direct supervisor was who?
19 A Chet Cornman.
20 Q Did he tell you whether Cindy was certain or
21  uncertain about deletions?
22 A No, he did not.
23 Q Now, you indicated that you became aware of a
24  billing, I guess discrepancy, that there were
25  not as much bills as there should be, or

Page 101

1   something like that.
2       How did you become aware of a billing
3   discrepancy? What brought that to your
4   attention?
5 A As I stated before, I looked at the financial
6   statements from Nuclear Cardiology in January
7   of 2002 and the charge activity and the
8   volume activity, the dollar figure and the
9   volume did not match the operational volumes.
10      So I -- and there was a regularly
11  scheduled billing meeting in which that was
12  discussed, and Cindy Hartman was a
13  participant in that meeting as well as Dr.
14  Rader (phonetic), who is the Nuclear
15  Cardiology lead physician, Tony Lasheski,
16  Chet Cornman, and myself. That was a topic
17  of discussion at that meeting, that although
18  we knew that the charge activity would be
19  down in November, which was the beginning of
20  Cindy's leave of absence, Cindy had indicated
21  on multiple occasions in December that all
22  charges were in. And we verified with her
23  again at that meeting in January that she --
24  that all charges were in, that she had
25  entered all charges for Nuclear Cardiology.

Page 102

1 Q Were there any particular doctors whose
2   charges were not charged?
3 A Can you please clarify the question?
4 Q The deletions of charges, were they randomly
5   scattered among all the physicians who
6   submitted bills, or were they focused on one
7   or more physicians?
8 A The charges were specific to Nuclear
9   Cardiology physicians, the -- the deleted
10  charges.
11 Q Um-hum.
12 A It was not one physician, it was multiple
13  physicians.
14 Q Did any of those physicians complain to you
15  that their charges were not as high as they
16  thought they might be?
17 A Dr. Rader, who was at the meeting in January,
18  stated that he did not believe that the
19  charge activity reflected the operational
20  activity.
21      So, my answer to that is yes.
22 Q He stated that at the meeting though, not
23  before the meeting?
24 A I don't recall if he stated it before the
25  meeting. I do recall that the billings were

Page 103

1   down in November, while Cindy was out. And
2   the financial statements would not have come
3   out for his review for December, to see if
4   the December charges had made up for the low
5   charge activity in November, until January,
6   and that's when we had the meeting. Now that
7   -- that was that specific instance.
8       However, there were physicians who, in
9   the past, had stated that they did not feel
10  that their charge activity reflected their
11  operational volume.
12 Q Who were they?
13 A The electrophysiology physicians had brought
14  to my attention that they didn't feel that
15  the volume of EKG's that they had interpreted
16  was reflected in their billings.
17 Q And what are their names?
18 A The -- the --
19 Q The physicians' names?
20 A The electrophysiology physicians' names are
21  Christopher Bonnet, John Chenaridds
22  (phonetic), and I believe it was only those
23  two that were employed at that time. It was
24  Dr. Bonnet who brought that to my attention.
25 Q And when did he bring that to your attention?



**Page 104**

1 A That was -- I don't recall exactly the time
2    period, but it was more than a year prior to
3    this billing irregularity. I would say one
4    to two years prior.
5 Q When he brought that to your attention one to
6    two years prior, was anything done to correct
7    that situation one to two years prior?
8 A Yes. As a matter of fact, I looked back to
9    see what caused that billing irregularity.
10    And the issue was that Cindy had not --
11    Cindy, who was the only biller at that time
12    responsible for that, had not entered many
13    pages worth of charge activity, approximately
14    fifty pages. That's my recollection at this
15    point. But, there were approximately fifty
16    pages in the turnaround document of EKG's
17    that she had not ever completed the charge
18    with the performing physician or done
19    anything with that charge whatsoever.
20    So, the technical charge had been
21    entered, but no professional component had
22    ever been billed.
23 Q So what -- when Dr. Bonnet complained of this
24    a couple years earlier, was his complaint a
25    couple years earlier, or was his complaint in

**Page 105**

1    January of '02 referring to something a
2    couple years earlier?
3 A His complaint was a couple of years earlier.
4    And I didn't really complete my last
5    statement, so, if you don't mind?
6 Q Um-hum.
7 A At that time, when I found that Cindy had not
8    completed those charges, my instruction to
9    her and my communication back to Dr. Bonnet
10    was that the charges did not match in the
11    billing system because the charge had never
12    been entered by Cindy. And my instruction
13    was that all charges that were appropriate to
14    be billed should -- needed to be billed out,
15    and they needed to be billed out timely.
16    The result of that was that Cindy
17    entered some of those charges, many of which
18    were more than a year old, and some of them
19    she deleted from the turnaround document at
20    that time.
21 Q Okay. So, when you're saying that she
22    entered these things that were more than a
23    year old, what year did she enter these
24    things that were more than a year old?
25 A As I stated, I don't recall when that

**Page 106**

1    occurred.
2 Q But it was a couple years before --
3 A That's correct.
4 Q -- the January 2002 event?
5 A That's correct.
6 Q Okay. Now, when she entered the things that
7    were more than a year old, did those charges
8    go through and were they paid?
9 A I have no recollection of whether those went
10    through and were paid. However, I will tell
11    you that many of the insurance carriers have
12    timely filing limits and will not pay after a
13    three-month period of time. It -- it varies
14    by payer, but some of them are as low as a
15    three-month period of time.
16 Q What disciplinary action was taken against
17    Cindy Hartman when this occurred some two
18    years earlier?
19 A We did not take any disciplinary action, with
20    the exception of talking to her to let her
21    know that we expected that every charge that
22    was appropriate to bill needed to be billed,
23    and needed to be billed in a timely --
24 Q Now, I see it indicated that she got a
25    promotion in that period of time. Can you

**Page 107**

1    explain that?
2 A No, I can't explain that. She was not my
3    employee.
4 Q When this happened a couple of years earlier,
5    who would be responsible for taking
6    disciplinary action against Cindy Hartman?
7    She wasn't your employee.
8 A Her immediate supervisor, I would say.
9 Q And that would be who?
10 A Chet Cornman.
11 Q And was he aware that she had made these
12    errors a couple of years earlier?
13      MR. JOHNSON: No foundation, so I
14    object to the form.
15 BY MR. ERNSBERGER:
16 Q To your knowledge, was he aware that she had
17    made these errors two years earlier?
18 A I don't recall any specific conversation or
19    memo, but I believe that he was aware.
20    Dr. Bonnet was certainly aware.
21 Q Would you expect him to issue a disciplinary
22    action against her for deleting these things
23    a couple of years prior to the 2002 event?
24      MR. JOHNSON: I'm going to object
25    to the form of the question.



Page 108

1 THE WITNESS: I would expect that
2 he would investigate what the reasons were
3 why she couldn't accomplish getting all of
4 the EKG's in and make a decision based on
5 that.
6 BY MR. ERNSBERGER:
7 Q Okay. Now, getting back to your audit of
8 Nuclear Cardiology in 2002, who initiated
9 disciplinary action, you or Cindy Hartman's
10 boss?
11 A I was Cindy Hartman's boss at the time the
12 disciplinary action was issued.
13 Q Chet Cornman was no longer there?
14 A No, he was not.
15 Q And did you do anything to determine why she
16 did delete those cardiology charges?
17 A No, I did not, because it was irrelevant as
18 to why they were deleted. It was
19 inappropriate that they were deleted.
20 Q Okay. Perhaps I misunderstood something.
21 You indicated that Chet Cornman would
22 consider disciplinary action two years
23 earlier, depending on what investigation was
24 done and what he found and why they were
25 deleted two years earlier.

Page 109

1 Now, in '02, when you're confronted with
2 a similar problem, I'm asking why you did not
3 investigate why those charges were deleted
4 before instituting disciplinary action.
5 MR. JOHNSON: What's the question?
6 BY MR. ERNSBERGER:
7 Q Why didn't you investigate why the charges
8 were deleted before starting disciplinary
9 action?
10 A Because on multiple occasions in December
11 Cindy had indicated that all charges that had
12 been submitted to her by the Nuclear
13 Cardiology Department had been entered into
14 the billing system.
15 Q And when you found that they had been entered
16 but deleted, did you ask why they were
17 deleted?
18 A They were not entered by Cindy yet. Cindy
19 had never entered the charges yet. She
20 deleted the items from the turnaround
21 document and never completed the professional
22 fee charge.
23 Q Did you do any investigation as to who
24 entered the information into the turnaround
25 document; was it her or was it her

Page 110

1 replacement substitute while she was out on
2 leave?
3 A It was not her replacement. Cindy only was
4 responsible for the professional component.
5 I had no reason to look to see who entered
6 the technical charge because I wasn't
7 investigating technical charges.
8 Q Okay. The people -- when Cindy was out on
9 leave, was anybody doing her work for her?
10 A There were several people who were doing the
11 coding piece of the work, providing the
12 information to the Pro-Fee Billing Department
13 and to a manager who worked for me at that
14 time, and there were billers in the back
15 office who volunteered on overtime to enter
16 the charges that the department provided to
17 us.
18 Q Okay. So when she came back from medical
19 leave, do you know what instructions she was
20 given as to the completeness of the work done
21 by others?
22 A I do not know specifically what instruction
23 was given to Cindy directly at that time.
24 Q Do you know whether the work done by others
25 was complete and done and up to date at the

Page 111

1 time Cindy Hartman came back to work?
2 A I knew that I had already discovered that the
3 billers who were entering the professional
4 charges for the Nuclear Cardiology Department
5 had not entered all of the five components of
6 the charge, that they only entered two of
7 those, and I recognized that before Cindy
8 came back to work and conveyed that to Chet
9 Cornman.
10 Those documents -- many of those
11 documents had already been returned back to
12 the department, and there were some documents
13 that were returned upon Cindy's return.
14 However, I had discovered that -- by
15 continuing to monitor the financial
16 statements, that the volume of charges that
17 had been entered in November and during --
18 just through the end of November, did not
19 match the operational volume. And I
20 investigated that and recognized that they
21 had missed three of the five charges that
22 needed to be billed.
23 And a decision was made at that point in
24 time between Chet Cornman and myself, that
25 Cindy was returning from her leave of absence

Page 112

1 and that she would be the one who would be
2 responsible for entering those charges.
3 Q   Okay.  So, while Cindy was on leave of
4    absence the people replacing her failed to
5    enter three of the five required charges; is
6    that right?
7 A   The people who replaced her were performing
8    Cindy's responsibilities, but they were
9    filling in and did not know Cindy's
10   processes.  They misinterpreted the schedule
11   and the information that was given to them
12   and entered only two of the charges of the
13   five.  And that was discovered immediately
14   and conveyed to the front end practice.
15 Q   So, when Cindy came back from leave, was she
16   told that she must then enter three of the
17   five -- the missing charges, the three out of
18   the five missing charges?
19 A   Yes, she was.
20 Q   Who told her that?
21 A   That was conveyed to her by Chet Cornman, and
22   in a follow-up conversation that I had with
23   her two days later where she had indicated
24   that she was caught up with all of the
25   billing from November and December during her

Page 113

1 leave.
2        When I expressed surprise that she was
3    already caught up within two days of
4    returning from leave, I asked her if she had
5    entered the charges that had been missed by
6    the Professional Fee Billing Department, the
7    three -- and I explained in detail the
8    charges that the Pro-Fee Department had
9    entered, which was for the supervision of the
10   stress tests and the cardiovascular stress
11   test itself.  They had billed those two
12   codes, but they had not billed the imaging
13   code.
14        And I had a conversation with Cindy two
15   days after her -- approximately two days to
16   my recollection, after her return, when she
17   indicated that she was caught up already,
18   that I was surprised that she was able to get
19   all of those charges in already.
20        I also had to two subsequent
21   conversations with her at the end of
22   December, to verify that she had entered all
23   of the charges by the end of December, which
24   would be the financial close for that month.
25 Q   Being surprised that she got the work done so

Page 114

1 quickly, did you do anything to check to see
2    whether it was done?
3 A   Yes, I did.  When the financial statements
4    came out and it didn't match the operational
5    volume, I began the audit.
6 Q   How many -- you indicated that you were
7    surprised that she could possibly get it done
8    in three days, how many days did you expect
9    it to take?
10 A   I thought it would probably take the rest of
11   December to get all of the current charges,
12   plus any backlog, to get all of that caught
13   up.
14 Q   Do you know whether there was anyone else
15   there to assist her in catching up on the
16   backlog of November and doing the current
17   charges of December?
18 A   A new biller had been hired by the name of
19   Sue Moore, and she began during -- she had
20   started her responsibilities in cardiology
21   that same week.  To my knowledge, she is the
22   only one who was assisting at that time.
23 Q   Did you ever ask Sue Moore whether she was
24   doing that work, or assigned to that work?
25 A   I -- I don't recall having a conversation

Page 115

1 with Sue Moore at that time.
2        However, Sue Moore was the -- one of the
3    people that I asked to assist me in checking
4    into the billing system to see if missed
5    charges were in -- I'm sorry, deleted charges
6    from the turnaround document had ever been
7    billed into the Signature System.
8 Q   So you used Sue Moore to do the audit on
9    Cindy Hartman, basically?
10 A   Sue Moore was a participant in that audit,
11   but she was not the sole person who was
12   performing that audit.
13 Q   Now, I'm still unclear why you're using the
14   word deletion.  I think you indicated that
15   after Cindy Hartman came back from leave the
16   other staff that had been filling in for her
17   had failed to enter information.  So, that's
18   not a matter of deletion, they simply failed
19   to enter it.
20        Now, when Cindy Hartman comes back,
21   you're saying that she also failed to enter
22   it.  So where does the issue of deletions
23   come from?
24 A   Cindy Hartman deleted the charges from the
25   turnaround document.  The turnaround document

Page 116

1  was a safety mechanism, that when a technical
2  charge was entered, that some of the
3  information related to that technical charge
4  would be immediately available to the person
5  who was billing the professional charge; and
6  it -- it prompted us to look for the
7  interpretation and to identify that that was
8  a charge that needed to be billed.
9  Q  Okay.  So --
10  A  And she deleted -- excuse me, I wasn't
11  completely finished with that.
12      She deleted the charges from the
13  turnaround document without completing that
14  charge.  Once the information is entered into
15  the turnaround document it gets transmitted
16  to the Physician Billing System.
17  Q  Are you saying that she deleted the two
18  charges that her replacements had done
19  correctly?
20  A  I'm saying she deleted charges that were
21  never billed.
22  Q  I guess I'm having difficulty understanding
23  how you delete charges that are never
24  billed.  I mean, I would think that you would
25  have to put them in and then delete them.

Page 117

1      And, if they never go in, how do you delete
2  them?
3  A  She deleted the information from the
4  turnaround document that drives the -- the
5  information on the turnaround document that
6  Cindy enters gets downloaded into a file that
7  goes to the Signature Billing System, goes
8  through a series of edits, and then is billed
9  out to the payers.  Cindy deleted the
10  turnaround document information so a
11  professional charge was never generated.  She
12  would have had the option of entering those
13  charges directly into Signature, but she also
14  did not do that.
15  Q  Does you computer system have anything called
16  a deletion report?
17  A  No.
18  Q  Are you telling me that there is no way to
19  determine whether a deletion has been made?
20  A  No.  What I'm telling you is that the report
21  is not titled that.  It's a -- I don't recall
22  the name of it, but it's not deletion report,
23  it's a financial audit report that indicates
24  whether the charge was sent to Signature or
25  whether it was deleted.

Page 118

1  Q  Okay.  So there is a report, whatever name it
2  is, that is a report of deletion?
3  A  It's a report of activity, either the charge
4  was sent to Signature or it was deleted, and
5  that's what's contained in it.
6  Q  Okay.  We'll call that, for the moment, a
7  deletion report.  Was a deletion report ever
8  printed out to identify her deletions?
9  A  Yes.
10  Q  When was it printed out?
11  A  I believe it was in February.
12  Q  Now, is there any reason why the deletions
13  identified by that deletion report could not
14  be corrected in February and properly billed?
15  A  That's what we did.  We -- when we completed
16  the audit, verified that they were
17  appropriate charges, we entered the charge at
18  that time.
19  Q  And so the mistake that she made in November
20  was correct in February?
21  A  The charges that she deleted were entered in,
22  I believe it was in March that they were
23  entered.
24  Q  Who did that entry?
25  A  To the best of my recollection, it was Sue

Page 119

1  Moore, who remained in the Cardiology Billing
2  Department.
3  Q  The lady you identified as helping you with
4  the audit of Cindy Hartman?
5  A  She was the sole cardiology biller in
6  cardiology at that time, yes.
7  Q  Did you ever consider that perhaps Sue Moore
8  was the one who failed to enter or Sue Moore
9  was the person who deleted the documents?
10  A  No.
11  Q  Why didn't you give that any thought?
12  A  Because Sue Moore was new in that department
13  and had extensive billing experience, but she
14  did not have any experience in the turnaround
15  documents.
16  Q  But, nevertheless, you decided that she would
17  be the one to do the audit?
18      MR. JOHNSON:  Object to the form of
19  the question.
20  BY MR. ERNSBERGER:
21  Q  Okay.  Once the deleted charges were
22  reinserted in March, were those deleted
23  charges then mailed to the insurance
24  carriers?
25  A  I don't know how those were processed.  I was




Page 120

1    the Director of Cardiology at that time.
2    They may have gone electronically or they may
3    have gone on paper. I don't know what
4    process they followed.
5  Q  After the deleted charges were re-entered and
6    billed, do you know whether the carriers paid
7    them?
8  A  I don't.
9  Q  Can you think of any reason why the carriers
10    would not pay them?
11        MR. JOHNSON: Object to the form of
12    the question, calls for speculation.
13        THE WITNESS: Untimely filing is a
14    possibility.
15  BY MR. ERNSBERGER:
16  Q  And you indicated that different carriers
17    have different timeliness requirements, some
18    are as short as three months, some are as
19    long as how long?
20  A  Greater than a year. Medicare's regulation
21    sometimes allows for payment, I think it's
22    probably a year and nine months. But I --
23    that's the best that I recall at this time.
24  Q  Now, the payment or nonpayment of the charges
25    that were deleted and then re-entered, is

Page 121

1    there any record of that in the documents
2    that have been provided to me, to your
3    knowledge?
4        MR. JOHNSON: Well, I -- I just
5    would like you to limit the question to
6    the documents the witness provided today,
7    because I don't know that she has knowledge
8    regarding what other documents were provided.
9  BY MR. ERNSBERGER:
10  Q  The payment or nonpayment, is there any
11    record of that?
12  A  I don't know if there's a record of that.
13  Q  Would you expect there to be a record of
14    that?
15  A  There would be a record on each individual
16    account and only a report if somebody
17    requested that. So, yes, I think somebody
18    would probably want to see whether that was
19    paid, but I don't have knowledge of whether
20    that occurred or not.
21  Q  So, are you aware of whether the documents
22    provided today would have a record of that,
23    of the payment of the charges that were
24    deleted and then put in correctly into the
25    system in March?

Page 122

1  A  Only the documents that I -- no, they would
2    not be in that pile.
3  Q  Now, you indicated that there was an audit of
4    Nuclear Cardiology done by yourself. Is that
5    in the documents that you've provided today?
6  A  Yes.
7  Q  You've also indicated that there's an audit
8    of Nuclear Cardiology that was done by the
9    Compliance Office, is that in the documents
10    that you've provided today?
11  A  No.
12  Q  You also indicated that there was an audit
13    done by the Compliance Office of Echo
14    Cardiology, is that in the documents provided
15    today?
16  A  To the best of my knowledge, it is. I
17    believe so.
18  Q  And you indicated that the Compliance Office
19    did an audit of the EKG's in general and the
20    ER EKG's in particular, is that in the
21    documents you provided today?
22  A  No, it isn't.
23  Q  I want to show you a document that I'll mark
24    as Exhibit No. 5. You will see that this
25    exhibit is dated May 14, 2003, but it's

Page 123

1    making reference to April '02 claims. So
2    when you read it you may note that in
3    particular.
4        (Whereupon, Exhibit No. 5 was marked for
5    identification.)
6        (The witness reviews the document.)
7        Okay.
8        MR. ERNSBERGER: May I see it?
9  BY MR. ERNSBERGER:
10  Q  Exhibit 5 is from Sandy Sessoms. Who is
11    Sandy Sessoms?
12  A  She is a director in Compliance.
13  Q  So, when you were referring earlier to an
14    audit done by Compliance, might Sandy Sessoms
15    know of those audits done by Compliance?
16  A  I would say that she probably would.
17  Q  Now, this says, or Sandy Sessoms says: "I
18    have also attached an e-mail that outlines
19    the review I did of April '02 claims, which
20    showed the edit was not working 100 percent
21    of the time."
22        When Sandy Sessoms is referring to a
23    review she did of April '02 claims, do
24    you know whether she's referring to a review
25    she did in April '02, or is she referring to



## Page 124

1  a review she did in May of '03 relating back
2  to '02?
3  A  She was referring to April -- dates of
4  service for claims in April of '02.
5  Q  So she --
6  A  I believe, to the best of my recollection.
7  Q  Okay.  So she was referring to ER records
8  dating from April '02.  And she was not
9  saying she did the audit in April '02, she's
10  saying she did the audit at some other time,
11  referring to that time frame of April '02?
12  A  Yes.  I believe that's what she's indicating.
13  Q  Do you know of your own knowledge when she
14  did the audit of the April '02 records?
15  A  I don't recall specifically when that was
16  done.
17  Q  Do you know whether it was done significantly
18  after April '02, or whether it was done at or
19  about April '02?
20  A  It was not done in April of '02, but I don't
21  know how much after April of '02 it was done.
22  Q  Do you know why the audit that she did was
23  focused on the month April of '02?
24  A  Probably because the edit request for HDS
25  edits was installed at the end of March.

## Page 125

1  Q  Okay.
2  A  And I recall having a conversation with her
3  to that regard, that we had installed an edit
4  based on the meetings that we had had to
5  capture charges before they went out
6  incorrectly.
7  Q  Okay.  If I am understanding you, what I
8  think you're saying is that in January of '02
9  you were aware of ER EKG double billings, and
10  that following that you changed the edit
11  computer program so as to capture those ER
12  EKG billings, and that edit computer program
13  was done in March and so she was testing it
14  in April.
15  Is that what you're telling me?
16  A  What I'm telling you is that we had looked
17  extensively and had several meetings
18  regarding whether any of the charge entry was
19  coming across and hitting an HDS edit and
20  appeared to be a double bill, that we had
21  recognized through that process that we could
22  fine tune the edit to capture more of those
23  claims so that we would not be sending out an
24  incorrect claim that had been entered by the
25  front end.

## Page 126

1  Q  So, basically, she was testing whether your
2  computer program that catches overcharges
3  worked?
4  A  She was testing -- yes, I would say that
5  that's true.
6  Q  And her conclusion was that your computer
7  program that catches overcharges did not
8  work, because she says here that it showed
9  the edit was not working 100 percent of the
10  time?
11  MR. JOHNSON:  I'm going to object
12  to the form of the question.
13  THE WITNESS:  In conversations that
14  I had later with Sandy Sessoms, that was not
15  the conclusion.  The conclusion was that the
16  edit was actually working at that time, but
17  the charges were being -- the charges were
18  being billed despite the edit stopping the
19  claims.
20  BY MR. ERNSBERGER:
21  Q  How did it come about that charges were being
22  double billed to Medicare despite the edit
23  stopping the claim?
24  A  I do not have personal knowledge of how that
25  happened, I was no longer in my role in the

## Page 127

1  Patient Financial Services Department when
2  that happened.
3  Q  Do you know whether anybody was disciplined
4  for double billing Medicare, even though the
5  edit discovered and was to stop that claim?
6  A  I'm not aware of any discipline that would
7  have occurred for somebody allowing a claim
8  to go through that was entered by the front
9  end staff.
10  Q  How was it discovered that the edit was
11  working 100 percent of the time and yet
12  Medicare double billing continued to occur?
13  A  I don't know that that was discovered
14  firsthand.
15  Q  You just know that from some other source
16  that that was what happened?
17  A  No, I don't.
18  Q  You want to offer an explanation of --
19  A  Yes.  Let me expound on that.
20  Q  Okay..
21  A  I am aware that the edits, you know, based on
22  that e-mail, that there were charges that
23  were going through.
24  Q  Okay.  So you're aware that Medicare was
25  double billed improperly and that charges

Page 128

1  were going through at the time this memo was
2  written?
3  A  For the April '02 claims, yes.
4  Q  But you don't know how it was happening that
5     Medicare was being billed twice, improperly,
6     for the April '02 claims?
7  A  No, I don't.
8  Q  Did you ever ask anybody how it was that
9     Medicare was being billed improperly for the
10    April '02 claims?
11 A  Can you -- I'm sorry, can you please repeat
12    the question?
13 Q  Did you ever ask anybody why it was that
14    Medicare was being billed improperly for the
15    -- double billed for the April '02 claims?
16 A  I don't recall asking anybody why they were
17    double billing.
18 Q  Were you able to determine how long it had
19    been going on?  Was it just April or was it
20    forever that they were billing Medicare
21    improperly, that is, double billing?
22 A  I believe I recall e-mails subsequent to that
23    that indicated that there was not an issue
24    with double billing.
25 Q  Well, in April of '02 was Medicare being

Page 129

1  double billed improperly?
2  A  According to the memo, according to the
3     e-mail that Sandy sent, she is indicating
4     that those were her findings.
5  Q  Do you know whether any refunds were ever
6     made to Medicare for the improper double
7     billing of the April '02 claims?
8  A  I don't have personal knowledge of that.  It
9     was not my area of responsibility at that
10    time.
11 Q  Now, given that there were improper double
12    billing of Medicare claims in April '02, was
13    there any investigation done to determine
14    whether there was also improper double
15    billing in March of '02 or May of '02?
16    MR. JOHNSON: I'm just going to
17    object to the form of the question because I
18    think you may be misstating the witness's
19    testimony and ignoring some of her answers
20    that she has given in response to the other
21    questions.  So I object to the form of the
22    question.
23    MR. ERNSBERGER:  Do you understand
24    the question?
25    THE WITNESS: Can you please ask

Page 130

1  the question again?
2  BY MR. ERNSBERGER:
3  Q  Given that there was improper double billing
4     in April of '02, was there anything done to
5     determine whether there was also improper
6     double billing done in the month before,
7     March, or the month after, May?
8     MR. JOHNSON:  And I also object to
9     the form of that question for the same
10    reasons.
11    MR. ERNSBERGER: Can you answer the
12    question?
13    THE WITNESS: The Audit Department
14    was conducting the -- I'm sorry, the
15    Compliance Department was conducting those
16    audits at my recommendation, based on the
17    fact that there were other cardiology issues
18    that had been identified by myself earlier in
19    2002.
20 BY MR. ERNSBERGER:
21 Q  So they would know the answer to that
22    question even though you might not know.  Is
23    that what you're saying?
24 A  Yes.
25 Q  I want to show you Exhibit No. 6.  You'll

Page 131

1  find this is a letter from Tom Vajda to Sandy
2  Sessoms with you carbon copied concerning
3  cardiology refunds, and it's November of
4  '02.
5     (Whereupon, Exhibit No. 6 was marked for
6     identification.)
7     (The witness reviews the document.)
8     Okay.
9  BY MR. ERNSBERGER:
10 Q  Okay.  The topic of this e-mail is cardiology
11    refunds.  Can you tell me what a cardiology
12    refund is?
13 A  I'm not sure why the title is that of
14    cardiology refunds for -- why they're using
15    that --
16 Q  That is the subject matter of these refunds.
17    What's this all about, if you know?
18 A  I don't recall specifically what the subject
19    is regarding cardiology refunds at this time.
20 Q  Do you know whether it has anything to do
21    with ER EKG's?
22 A  No, I don't know specifically if that's what
23    that is.
24 Q  Do you know whether it has anything to do
25    with the deletion of charges in Nuclear



Page 132

1    Cardiology that happened the year before?
2 A  I believe it has to do with the deletion of
3    charges, but not necessarily Nuclear
4    Cardiology, because we had already rebilled
5    the deleted Nuclear Cardiology charges prior
6    to that date.
7 Q  Well, this is addressed, or at least carbon
8    copied to you. What do you understand to be
9    the subject of this memo? What happened?
10 A  I don't recall. I think if there were other
11    documents that you could produce surrounding
12    that date I would be able to tell you, but I
13    don't recall that at this time.
14 Q  When you use the term refund, what do you
15    understand by that term? Is that refunding
16    money back to Medicare or Medicare refunding
17    money to AGH or what?
18        MR. JOHNSON: Are you referencing
19    it in the context of a particular writing or
20    document or the word in general?
21        MR. ERNSBERGER: In particular, to
22    this document, what is meant by a refund?
23        THE WITNESS: I don't believe the
24    title of that document supports the substance
25    of what the document is about. I believe

Page 133

1    there must be other e-mails that we're not
2    seeing at this time that would help me to
3    recall what that is, but the substance of the
4    document does not address refunds.
5 BY MR. ERNSBERGER:
6 Q  Okay. Well, what is the subject matter of
7    the substance of the document?
8 A  It's discussing how to enter the information
9    to register patients into the Signature
10    Billing System so that charges can be billed
11    to the carrier.
12 Q  Okay. So this is a document that is
13    explaining how billing is made in the first
14    instance, how the information is put into the
15    system?
16 A  No, it's not explaining that at all. They --
17    this document is referencing a recreation of
18    a registration that's no longer in the
19    system, so making the rebilling process more
20    difficult.
21 Q  Help me. What do you mean by that?
22 A  Can you tell me what specifically you don't
23    understand?
24 Q  Could you start at the beginning and tell me
25    what's happening that is leading up to that

Page 134

1    letter and why that letter is written?
2 A  I don't recall why this letter is written. I
3    can only tell you that the substance does not
4    match the subject matter.
5 Q  Okay. But the substance of the letter has to
6    do with billing; right?
7 A  It has to do with the registration process.
8 Q  Do you know why the registration process is
9    at issue in this letter?
10 A  I can tell from this document that the
11    registration is no longer sitting in the
12    billing system, which means that it was --
13    that there were no charges in the system for
14    that particular registration and that the
15    registration no longer existed. So it had to
16    be recreated into the billing system.
17 Q  Do you know how that came about, that there
18    would be no registration for, I take it, a
19    particular registration?
20 A  As I said, after a certain amount of time, if
21    there is no charge in the system against that
22    registration, the registration is no longer
23    available to enter charges against.
24 Q  Oh, that's just an automatic thing, the
25    computer is designed so that if the patient

Page 135

1    hasn't been there in a while, there's no more
2    charges entered on that patient's account?
3 A  No, sir, that's not true.
4 Q  Okay.
5 A  There is a separate registration for every
6    date of service, typically. And if the
7    patient came in and they were registered for
8    that particular date of service and no charge
9    was entered for that date, the registration
10    becomes -- is no longer available after a
11    period of time.
12 Q  Do you know why -- do you know whether that
13    document has any significance to this case?
14        MR. JOHNSON: I'm going to object
15    to the form of the question, but you can try
16    and answer it if you can.
17        THE WITNESS: I think the substance
18    of this is that one of the audits was
19    completed and there were charges that had
20    been deleted that needed to be re-entered,
21    and they were recreating the registration so
22    that these inappropriately deleted charges
23    could be re-entered into the system. And
24    they had to engage IS, the Information System
25    personnel to assist them in recreating the

Page 136

1 registrations in order to enter the charges.
2 BY MR. ERNSBERGER:
3 Q Okay. Is this referring to Cindy Hartman's
4 deletions of charges or somebody else's
5 deletions of charges?
6 A This would be referring to Cindy Hartman's
7 deletions of the charges. There --
8 cardiology is unique in having a turnaround
9 document like this.
10 Q You see this is November 11, '02, and she
11 came back from leave in November 11, '02?
12 A No. She came back from leave in November of
13 '01 -- or, December of '01. I'm sorry.
14 Q Okay. So this is a memo concerning deletions
15 of charges a year later.
16 Do you know why it's written a year
17 later?
18 A I can -- the audits were ongoing, at my
19 request, after we had already identified that
20 there were problems with Nuclear Cardiology
21 billing. It takes -- it took many months to
22 complete all of the audits of all of the
23 cardiology departments because there was an
24 -- is extensive volume in that area.
25 So, at the time that the audits are

Page 137

1 complete and all charges are -- all services
2 are verified that a professional component
3 would need to be charged, that's the time
4 when we would enter the charge.
5 So it would be entirely appropriate that
6 we would enter the charges after all of that
7 information was verified, and it may have
8 been -- it could be a year later, yes.
9 Q Perhaps I misunderstood your earlier
10 description. As I understood it originally,
11 Cindy made the deletions sometime in
12 December. Those were discovered in January,
13 a deletion printout was made and the charges
14 were re-entered in March.
15 Is that -- is your earlier testimony
16 wrong?
17 A No. My earlier testimony was specific to
18 Nuclear Cardiology. There were several other
19 cardiology departments that submitted bills,
20 and it was found in subsequent audits that
21 Cindy was deleting charges from those
22 departments as well as Nuclear Cardiology.
23 Q So you're saying this has nothing to do with
24 cardiology deletions occurring in Nuclear
25 Cardiology in November or December of '01,

Page 138

1 this is something completely different?
2 A No, I don't believe it's something completely
3 different. I think it's the problem that I
4 identified in January with Cindy deleting
5 charges inappropriately, but it was found in
6 other departments besides Nuclear
7 Cardiology. So I feel that it is very much
8 related to my audit in January.
9 Q Did the deletions in the Nuclear Cardiology
10 Department occur at the same time as the
11 deletions in these other cardiology
12 departments, or was it a completely separate
13 event?
14 MR. JOHNSON: I don't understand
15 the question, so I object to the form.
16 MR. ERNSBERGER: Well, I'm trying
17 to understand what you're saying here.
18 BY MR. ERNSBERGER:
19 Q You're saying that there were deletions in
20 Nuclear Cardiology that were done in December
21 of '01; right?
22 A That's correct.
23 Q And you're saying that there were deletions
24 in other cardiology areas that were done at
25 the same time, December '01 or some other

Page 139

1 time?
2 A There was a wide range of dates that was
3 audited by the Compliance Department, and I
4 don't recollect what those dates were.
5 Q So it could have been the same, December '01,
6 or it could have been some other month
7 entirely?
8 A The information is available in the audits
9 that I gave you today. It extended over a
10 several-month period of time.
11 Q Okay. I'd like to mark the next document as
12 Exhibit No. 7. It's from you to Sandy
13 Sessoms and it's talking about the MUSE
14 System.
15 (Whereupon, Exhibit No. 7 was marked for
16 identification.)
17 (The witness reviews the document.)
18 THE WITNESS: Okay.
19 BY MR. ERNSBERGER:
20 Q In this document you're saying that Sue Moore
21 looked these up, meaning the ER EKG's -- up
22 in the MUSE System, and that the MUSE System
23 is the only way of validating whether these
24 were appropriate charges.
25 Is that what you're saying here, that

Page 140

1 the MUSE System is the only way to really
2 determine whether a billing is a proper
3 billing or not?
4 A It was the only way of verifying how many
5 EKG's were in the system and whether the
6 volume of EKG's billed was correct.
7      There are many other pieces of billing
8 that we haven't talked about. There are many
9 components. Billing is very complex. So I
10 would just say that the MUSE System was the
11 means of verifying the number of EKG's and
12 looking at the actual tracings in the system
13 to verify how many had been billed against
14 how many had actually been performed.
15 Q So, using that system you could determine
16 whether or not an EKG was improperly double
17 billed?
18 A You could identify whether there was one EKG
19 that had been overread by the cardiologist or
20 two separate EKG's that had been done with
21 interpretations done by two different
22 physicians.
23 Q One circumstance being an improper double
24 billing, and the other circumstance being a
25 proper double billing?

Page 141

1 A That's true, yes.
2 Q So the MUSE System could be used to determine
3 those two facts, whether it's a proper or
4 improper double billing?
5 A Potential improper billing; because there
6 still is this instance where the cardiologist
7 is interpreting EKG's that the ED physician
8 already interpreted where the overread is an
9 important component of how the patient is
10 treated.
11 Q And the MUSE System is what you used to
12 determine whether that has happened or not,
13 whether it's a proper overbilling or an
14 improper overbilling?
15 A The MUSE System was one of many things that
16 we had in place to try to make sure that the
17 billing was proper.
18 Q I want to mark the document as Exhibit No. 8.
19 Again, this is from to you and dated
20 November 24, '03. And it says: "Hi, Linda,
21 this is regarding the issue of Cindy
22 Hartman."
23      (Whereupon, Exhibit No. 8 was marked for
24 identification.)
25      (The witness reviews the document.)

Page 142

1      THE WITNESS: All right.
2 BY MR. ERNSBERGER:
3 Q Is there anything you'd like to explain about
4 the MUSE System and whether or not it adds
5 value?
6 A The MUSE System adds value by identifying the
7 number of EKG's that were performed that were
8 interpreted by the cardiologist. It does not
9 reflect whether there is added value by that
10 cardiologist's interpretation compared to the
11 emergency room physician's interpretation,
12 which is contained in the medical record and
13 not in the EKG MUSE System.
14 Q So how can that be determined, whether
15 there's added value?
16 A That can be determined by the physician who
17 is doing the overread and comparing it to the
18 documentation of the emergency room
19 physician.
20 Q Is there any way for the biller to make that
21 determination, as to whether there is added
22 value?
23 A The biller can determine by the number of
24 documents, by the number of charges that show
25 up on the turnaround document, whether that

Page 143

1 reflects the number of EKG's that were
2 actually done, and can question if there are
3 more EKG's on the turnaround documents than
4 what appear in the MUSE System.
5 Q All right. Let's go on to the exhibit we're
6 working on right now, I think Exhibit No. 8.
7 A I've not reviewed this whole document yet.
8 Would you please give me a couple of
9 minutes?
10 Q Sure.
11 A (The witness reviews the document.)
12 Q I think there's a second page to it, and
13 perhaps this is it. It's Bates No. 462, it
14 follows 461.
15 A Okay.
16 Q The top of this document indicates that it's
17 from you dated November 24, 2003 and directed
18 to Linda Crawford, carbon copied to Sandy
19 Sessoms.
20      Who is Linda Crawford?
21 A She is the current Director of Patient
22 Financial Services for the Pro-Fee Billing
23 Department.
24 Q She has your old job?
25 A She does.



Page 144

1 Q  And now you are what?
2 A  Director of Cardiology at Allegheny General.
3 Q  Now, in this document you say: "Hi, Linda,
4     this is regarding the issue of Cindy
5     Hartman.  The review was done to determine if
6     there was double billing, but there were a
7     few accounts where payments had not been
8     returned yet to the payer.  Can you have your
9     staff process these returns?  Sue verified
10    the EKG's in the MUSE System."
11        Can you tell me what this is all about?
12 A  That was in response to the audit that was
13    conducted by the Compliance Department.  And
14    Sue Moore, who is the biller in cardiology,
15    assisted Sandy Sessoms in that audit, during
16    that audit, by looking into the MUSE System
17    to see the number of EKG's that had been
18    performed.  And it's in response to the
19    finding of the audit.
20 Q  It says: "This is regarding the issue of
21    Cindy Hartman.  The review was done to
22    determine if there was double billing."
23        How does -- how is Cindy Hartman
24    connected with double billing?
25 A  Because the audit spanned the time period

Page 145

1     where Cindy Hartman was doing the cardiology
2     billing, and Cindy is the person who enters
3     -- who entered the charges into the system.
4 Q  What were the findings?
5 A  The findings were listed there in that there
6     were patients who needed refunds that had
7     been -- where we had been overpaid.
8 Q  Now, you indicated the findings were listed
9     there.  Are you referring to Deposition
10    Exhibit No. 8?
11 A  Yes.
12 Q  And where on Exhibit 8 are the findings of
13    double payment?
14 A  There is an e-mail from Sue Moore to Mary
15    Beth stating that the patients, where we were
16    paid for both the emergency room
17    interpretation and the cardiologist's
18    interpretation of EKG's.
19 Q  And it appears from this document that
20    refunds were made to Medicare for bills
21    issued by Dr. Fisher and Dr. Bonnet.
22        Is my understanding correct?
23 A  Yes.
24 Q  Do you know why the double billing occurred
25    as to these doctors, as opposed to other

Page 146

1     doctors?
2 A  There were only three physicians who did the
3     overreads.  There were three physicians in
4     the AGH electrophysiology group who did the
5     interpretations for all EKG's that were done
6     at Allegheny General, and that included
7     overreads of EKG's that had been interpreted
8     by the emergency room physicians, and those
9     physicians were Dr. Bonnet, Dr. Fisher and
10    Dr. Chenaridds.
11 Q  Do you know whether Dr. Fisher -- Dr.
12    Fisher's name had been inserted into your
13    edit program?
14 A  It had been requested to be inserted into the
15    edit program in February of 2002.  And I
16    believe that edit was installed in March of
17    2002.  However, I had left my role in the
18    Financial Department at that time.
19 Q  And these indicate that the bills were dated
20    April of 2002.  Is it therefore correct to
21    say that the edit used to discover Dr.
22    Fisher's bills didn't work correctly?
23 A  No, it's not fair to say that.  The edit
24    could have been working correctly and the
25    bill could have been manually processed and

Page 147

1     sent through to the payer.
2 Q  Now, Dr. Bonnet, do you know whether his name
3     was included in the edit?
4 A  Yes.  Actually, let me back up a little bit.
5     I'm certain of how the edit was specifically
6     worded at that time.  However, Dr. Bonnet was
7     part of the AGH electrophysiology group that
8     was included on that edit.
9 Q  Do you have any explanation or understanding
10    as to how these double billings occurred
11    despite the edit?
12 A  The double billings could occur by manually
13    pushing the claims through.
14 Q  The next document is November 24,'03.  We'll
15    mark that as Exhibit No. 9.
16        (Whereupon, Exhibit No. 9 was marked for
17    identification.)
18 BY MR. ERNSBERGER:
19 Q  This is an e-mail from Linda Crawford to
20    yourself, with a carbon copy to Sandy
21    Sessoms.  It relates to -- I guess it covers
22    the same thing as Exhibit 8.  Let's move on
23    to the next one.
24        The next document will be marked
25    Exhibit No. 10.

Page 148

1      (Whereupon, Exhibit No. 10 was marked
2    for identification.)
3  BY MR. ERNSBERGER:
4  Q  This is an e-mail from Sandy Sessoms to
5    yourself saying: "Kathy, just a reminder to
6    let me know the specific allegations of the
7    lawsuit regarding the cardiology area;
8    thanks."
9        MR. JOHNSON:  Can I see Exhibit 9,
10   please?
11       MR. ERNSBERGER:  Sure.  And if you
12   compare it to No. 8 --
13     (The witness reviews the document.)
14 BY MR. ERNSBERGER:
15 Q  As I indicated this exhibit, it says: "Just
16   a reminder to let me know the specific
17   allegations of the lawsuit regarding the
18   cardiology area."
19     What lawsuit is this referring to?
20 A  This lawsuit.
21 Q  Okay.  Exhibit 11.
22     (Whereupon, Exhibit No. 11 was marked
23   for identification.)
24 BY MR. ERNSBERGER:
25 Q  Next I'll direct your attention to

Page 149

1    Exhibit 11.  It is a letter from Linda
2    Crawford to Sandy Sessoms, Re:  EKG
3    Cardiology Pro-Fee Review.
4  A  (The witness reviews the document.)
5      Okay.
6  Q  The Pro-Fee Review referred to here, is that
7    the same as double billing for EKG's, or is
8    that something different?
9  A  The Pro-Fee Review was an audit that was an
10   extension of what I had begun in January of
11   2002 to investigate irregularities in
12   cardiology billing that was performed by the
13   front end billing staff.
14 Q  Okay.  So, Pro-Fee Review is not necessarily
15   double billing of ER EKG's, it is a more
16   expansive audit of other things?
17 A  I believe Pro-Fee Review in that context was
18   the Pro-Fee Department did their portion of
19   what they needed to do to assist Compliance
20   in that audit.
21 Q  Now, you indicated that the audit that you
22   initiated in January of '02 was something
23   more than just Cindy Hartman's deletions, it
24   included EKG reports from the ER and other
25   factors.

Page 150

1      Is this one of the other factors, or is
2    this -- is this one of the other factors?
3  A  It is one of the items that was to be audited
4    based on my initial findings, yes.
5  Q  Now, when you're talking about Pro-Fee, what
6    are the Medicare requirements in terms of
7    billing, for example, must a doctor and
8    billing person code only for the services
9    rendered?
10       MR. JOHNSON:  Are you asking a
11   specific question?
12 BY MR. ERNSBERGER:
13 Q  Is this having to do with ER EKG's or some
14   other billing issue?
15 A  That specific audit that's referenced in
16   there relates to EKG's, but it was an
17   extension of my original request to audit for
18   billing irregularities in cardiology.
19 Q  Okay.  What kind of billing irregularities,
20   other than ER EKG's, were the subject matter
21   of the audit?
22 A  There were multiple audits that were
23   initiated by myself in January 2002 that
24   related to deletions of appropriate charges
25   from the turnaround document for the various

Page 151

1    cardiology areas.  The emergency room EKG's
2    was just one area of many that we audited.
3  Q  Now this document says: "Kathy, Tom, and I
4    met today to review the findings from MUSE.
5    It appears that there are 32 instances where
6    a refund is due to HGSA, and six instances
7    where we were underpaid. "
8        Now, when you're talking about a refund
9    due to HGSA, what are you talking about?
10 A  That specific phrase means a refund to
11   Medicare.
12 Q  And when it refers to 32 instances where a
13   refund is due to Medicare, what is the --
14   what is the need for the refund; is it double
15   billing of EKG's or is it some other issue?
16 A  Medicare repayments or overpayments can be
17   for any service.  I believe that's
18   referencing the ER EKG's.
19 Q  Now this particular audit, do we know the
20   time frame of this particular audit, you
21   know, which month it covered or some
22   collection of months?
23 A  I don't recall the time frame.  The audit was
24   done by the Compliance Department.
25 Q  Do you know whether the time frame which is

HARTMAN vs. AGH                     Condenselt!™                     KATHY DELOPLAINE

Page 152

1  the subject matter of this audit was while
2  Cindy Hartman was still employed?
3 A  I don't recall that.
4 Q  Now, it indicates that there were 32
5  instances where a refund is due. Was any
6  determination made as to why the double
7  billing did occur for these -- in these 32
8  instances?
9 A  I was not conducting the audit, so I'm not
10  certain of all of the steps. I was asked by
11  Compliance to assist.
12 Q  The particular audit that is referred to in
13  this Deposition Exhibit 11, is it found in
14  the documents that you provided today?
15 A  No, it is not.
16 Q  In Exhibit 4 -- this is your memo of
17  January 10, '02 -- you say that the problem
18  with the ER EKG's is something that we were
19  cited for a few years back. Presumably, that
20  would take us back into the 1990's, sometime
21  in the late 1990's, and Exhibit 11 shows
22  that there is still a problem with ER EKG's.
23     Do you know why the problem has not been
24  solved from the late 1990's all the way up to
25  2003?

Page 153

1 A  Many systems were put into place to prevent
2  human error from occurring on the front end
3  to solve the problems. But systems were in
4  place to solve the problems or to capture
5  potential double billings, but it does not
6  completely replace human error.
7     And so when those instances are found we
8  -- where there is human error we go back and
9  reimburse Medicare appropriately at that
10  time. And we continue to have ongoing means
11  of auditing what was occurring and correcting
12  the problem. It's a very complex system.
13  There are multiple systems that interact that
14  can affect the billing and it's -- we have
15  made many efforts to correct the human error.
16 Q  Do you know whether you've come up with a
17  system today that has resolved the human
18  error question that you refer to?
19 A  I believe there will always be human error,
20  but we have a processes in place and people
21  who are diligent at their jobs that research
22  the charges before entering them and enter
23  them appropriately. The edits that are built
24  in will help us to catch any human error that
25  occurs.

Page 154

1 Q  Exhibit No. 12.
2     (Whereupon, Exhibit No. 12 was marked
3  for identification.)
4 BY MR. ERNSBERGER:
5 Q  Next I want to direct your attention to what
6  I've marked as Exhibit No. 12.
7 A  (The witness reviews the document.)
8     Okay. It doesn't appear that that's the
9  complete document. There's no header at the
10  top stating who that memo was directed to.
11     MR. JOHNSON: Off the record.
12     (Whereupon, a short conversation took
13  place off the record.)
14 BY MR. ERNSBERGER:
15 Q  Here's Bates No. 467, that precedes 468. So
16  perhaps you can tell me whether this supplies
17  the missing header that you need?
18 A  (The witness reviews the document.)
19     MR. JOHNSON: Are you going to be
20  making that a part of Exhibit No. 12?
21     MR. ERNSBERGER: I will. I'm going
22  to need to make a photocopy of it before I
23  attach it to Exhibit 12, but, yes, if she
24  needs it, I'll attach it to Exhibit 12.
25     THE WITNESS: Yes.

Page 155

1     MR. JOHNSON: And then, just so
2  it's clear, that's Bates 467. That goes with
3  468.
4     MR. ERNSBERGER: Right. Okay. Can
5  I have them both?
6     (The witness complies.)
7 BY MR. ERNSBERGER:
8 Q  The header on 467 looks like it's from you
9  and directed to Sandy Sessoms and others.
10  And then the text on 468, I can't tell
11  whether that's from you or from someone else,
12  can you tell me, at the top of 468 there?
13 A  Which area?
14 Q  The highlighted section.
15 A  The highlighted section is from Robert
16  Michalski.
17 Q  Okay. And so your response on 467 is
18  responsive to his comments on 468?
19 A  That's correct.
20 Q  Who is Robert Michalski?
21 A  He is the Vice-President of Compliance for
22  the West Penn Allegheny Health System.
23 Q  And his words are: "Where in world did all
24  of these come from? How come these were not
25  identified before when this was reviewed on

Page 156

1  prior occasions?  Do were need to revise the
2  letter we sent to Medicare last week adding
3  all these to see if any take backs occurred
4  on any of these?  Could any of these possibly
5  be appropriate double payments?  This is very
6  troubling based on previous findings when
7  supposedly we looked for double payments."
8      Apparently, he's writing this message to
9  you.  What is the context of the message?
10 Why is he writing it to you?
11 A  I don't believe I'm the only one he's writing
12    that to.  I'm copied on that, but I'm not the
13    only person that is addressed to.
14 Q  Well, what is the context of this message?
15    Was there a recent discovery of more
16    overbillings or what?
17 A  Of his message?
18 Q  Yes.
19 A  There was a continuing audit that the
20    Compliance Department was conducting.
21 Q  And this message is in response to the
22    continuing audit indicating that still more
23    double billings appear to have occurred; is
24    that right?
25 A  More in comparison to what?  The time frame

Page 157

1  was an extensive time frame that included
2  some of our initial findings.
3 Q  Okay.  But he's saying, "Where in the world
4    did all of these come from?"  Apparently,
5    this is new material.  Can you tell me what
6    was new?
7 A  I'm not the one who conducted the audit.  I
8    did receive the spreadsheet, and I've
9    outlined in my e-mail my response to his
10    comments.
11 Q  Okay.  And what is your response to his
12    comment, "Where did all these come from?"
13 A  Okay.  I'll read -- I'm reading this verbatim
14    from my e-mail.  This is addressed to Robert
15    Michalski, Sandy Sessoms, Tom Vajda, and
16    Linda Crawford, and cc'd to Paula Hooper.
17    The subject was AGH EKG Cardiology Pro-Fee
18    Review.
19      "I don't think there are as many cases
20    that are issues as it appears on first blush.
21    There are 58 cases on this document for a
22    very extensive period of time.  On 26 of
23    them, there have obviously been more than one
24    EKG done, and the EP doctor is the one
25    interpreting.  In many of the multiple

Page 158

1  charges, not all of them were paid.  We may
2  have, in fact, been underpaid.  See the
3  attached.  The ones highlighted in yellow are
4  the multiple cases.  This indicates to me
5  that the patient was most likely admitted
6  after coming through the ER and had multiple
7  EKG's billed by EP that were appropriate.
8  The billers have access to view the MUSE
9  System to see how many EKG's were actually
10 done, so they know how many can be billed.
11     For the 32 remaining cases where only
12 one EKG was billed by each the ER and the EP
13 doctor, we need to sort out what happened.
14 These could all be appropriate, but I think
15 they are more at risk than the above cases.
16     For a period of time, the edit in HDS
17 was not working, and some of these fall into
18 that time frame.  Tom and Linda could better
19 define the time period that there was a
20 problem with HDS.
21     There is always the possibility of human
22 error on both the charge entry side and the
23 billing side.  Even if the edit stops the
24 claim, it can be manually billed.  We need to
25 look at the remaining cases -- look the

Page 159

1  remaining cases up in MUSE to see the
2  appropriate number that should be billed, and
3  compare it to the reports.  If they should
4  not have been billed, we need to identify the
5  breakdown.
6      Please let me know how you would like us
7  to proceed."
8 Q  Do you know, did you follow up and determine
9    which of those were truly improper billings?
10 A  I followed up to identify those that were
11    appropriately billed, which in my
12    recollection was the majority of the cases.
13    However -- that's my recollection at this
14    time.  And I identified those that had the
15    potential to be inappropriately billed.
16 Q  And the number that had the potential of
17    being inappropriately billed was how many?
18 A  There were 32 cases where there -- where only
19    one -- where the EKG was billed by the ER
20    physician and the EP doctor.
21 Q  Do we know the time frame that was studied
22    here?
23 A  Yes, it's stated in the e-mail.  It's 5 of
24    '02, May of 2002 through April of 2003.
25 Q  So this is after Cindy Hartman had left?

Page 160

1 A  Yes, it is.
2 Q  And, for that matter, the study that was done
3     in April of '02 was after Cindy Hartman was
4     suspended?
5 A  That's true.
6 Q  So Cindy Hartman couldn't be responsible for
7     either the April or the more recent studies?
8 A  That's correct.  Cindy Hartman could not have
9     been responsible for those.
10        MR. ERNSBERGER: I think that's all
11 we can do today.
12        MR. JOHNSON:  Okay.
13     (Whereupon, this proceeding was
14 concluded at 3:30 p.m., to be continued at a
15 later date.)
16     (Whereupon, signature was not waived.)
17
18
19
20
21
22
23
24
25

**-$-**

$1,015.80 [1] 44:11
$26,979 [1] 44:10

**-'-**

'01 [17] 51:7 54:5 55:11
64:12 66:23 71:10,25
72:10 73:3,3 77:20 136:13
136:13 137:25 138:21,25
139:5

'02 [42] 54:9,15,25 71:11
71:25 72:11 73:4 105:1
109:1 123:1,19,23,25
124:2,4,8,9,11,14,18,19
124:20,21,23 125:8 128:3
128:6,10,15,25 129:7,12
129:15,15 130:4 131:4
136:10,11 149:22 152:17
159:24 160:3

'03 [2] 124:1 141:20
147:14

'97 [2] 9:19 10:10

**-1-**

1 [7] 39:9,10 40:10 41:25
44:4 81:11,18
10 [4] 79:19 147:25 148:1
152:17
100 [3] 123:20 126:9
127:11
10th [4] 71:11,25 72:11
73:4
11 [7] 136:10,11 148:21
148:22 149:1 152:13,21
12 [6] 154:1,2,6,20,23,24
12:00 [1] 79:10
14 [1] 122:25
15214 [1] 4:19
19 [3] 53:23 54:25 55:6
1974 [3] 5:4,6,7
1979 [1] 5:13
1981 [1] 5:20
1985 [2] 5:18,19
1988 [5] 5:7,16 6:15
1990's [3] 152:20,21,24
1996 [1] 6:16
1997 [16] 7:17,18,19
10:13 11:4 12:4 23:24
24:7,13 25:24 26:6 33:7
37:12 38:13,18 82:24
1998 [2] 24:7 33:10 11
34:19 35:6 38:21 39:13
50:15 81:14
1999 [3] 35:11,19 35:1
19th [5] 54:5 55:14 54:12
71:10,25 72:10 73:2 3
77:20

**-2-**

2 [4] 39:22 40:6,7 43 5
2000 [2] 36:7,21
2001 [10] 36:24 37: 3

38:18 53:23 54:25 55:6
74:1 88:13 94:13 97:2
2002 [20] 5:2 6:6 7:23
54:11,19,23 79:19 84:7
99:12 101:7 106:4 107:23
108:8 130:19 146:15,17
146:20 149:11 150:23
159:24
2003 [4] 122:25 143:17
152:25 159:24
20th [2] 55:11,14
215 [1] 4:18
24 [3] 141:20 143:17
147:14
26 [1] 157:22

**-3-**

3 [8] 39:24 50:19,20 64:24
67:16,25 72:9 77:21
31 [1] 39:13
31st [1] 50:15
32 [6] 151:5,12 152:4,7
158:11 159:18
3:30 [1] 160:14

**-4-**

4 [5] 79:14,15 81:17,21
152:16
461 [1] 143:14
462 [1] 143:13
467 [4] 154:15 155:2,8,17
468 [5] 154:15 155:3,10
155:12,18

**-5-**

5 [4] 122:24 123:4,10
159:23
58 [1] 157:21

**-6-**

6 [2] 130:25 131:5

**-7-**

7 [2] 139:12,15

**-8-**

8 [7] 141:18,23 143:6
145:10,12 147:22 148:12

**-9-**

9 [3] 147:15,16 148:9
99284GC [5] 41:20
42:20,23 43:6 44:19
99285GC [1] 41:20

**-A-**

able [11] 45:23 46:1 73:12
74:15,18,20,23 89:6
113:18 128:18 132:12
above [2] 25:2 158:15

absence [8] 5:16,17
99:15,21 100:2 101:20
111:25 112:4
access [7] 32:8 73:16,23
74:2,7 75:19 158:8
accomplish [1] 108:3
according [3] 8:10 129:2
129:2
account [3] 29:12 121:16
135:2
accounts [12] 8:4 29:5
30:1,3,7,10,19,22 31:5,
67:10 73:8 144:7
accuracy [1] 62:22
accurately [1] 49:5
acquire [1] 6:5
action [9] 106:16,19
107:6,22 108:9,12,22
109:4,9
activity [10] 101:7,8,18
102:19,20 103:5,10
104:13 118:3
actual [4] 26:7 44:10
74:21 140:12
add [2] 38:12 85:11
added [3] 142:9,15,21
adding [1] 156:2
addition [2] 26:23 97:21
additional [7] 22:16
23:6 39:19,22 90:2 94:6
95:22
additions [1] 34:20
address [3] 4:17 24:12
133:4
addressed [5] 40:14 73:1
132:7 156:13 157:14
adds [4] 23:7,10 142:4,6
administration [4] 4:25
81:23 83:6,10
administrative [1]
51:12
admitted [1] 158:5
adopt [1] 38:8
affect [1] 153:14
afternoon [1] 79:12
again [17] 17:4 28:10 31:7
31:12,16 36:16 44:3 50:14
64:5 65:6,7 67:16 71:2
76:17 101:23 130:1
141:19
against [7] 66:15 106:16
107:6,22 134:21,23
140:13
agencies [1] 43:14
AGH [8] 51:3 56:12
81:24 83:3 132:17 146:4
147:7 157:17
agree [1] 70:22
ahead [1] 42:7
allegations [26] 148:6,17
Allegheny [2] 6:2 8:6
8:12,17,22 9:1,3,5,10,18
10:8 12:17,20,24 13:6,13
13:16 14:7,17 15:1 18:17

41:5 51:6 144:2 146:6
155:22
allowing [1] 127:7
allows [2] 80:2 120:21
along [2] 10:16,17
always [5] 29:2 99:17,18
153:19 158:21
ambiguous [1] 66:5
America [1] 4:9
among [1] 102:5
amount [1] 134:20
analysis [1] 86:13
analyst [6] 6:24 7:7
31:23 32:5,6 35:8
analysts [1] 31:19
answer [12] 6:10 17:14
37:11 42:8 58:17 61:4
65:5 85:8 102:21 130:11
130:21 135:16
answered [3] 6:7 26:4
28:8
answering [1] 65:8
answers [1] 129:19
anyway [1] 99:18
apparent [2] 80:14
appeal [2] 20:19 26:10
appear [5] 30:22 40:3
144:4 154:8 156:23
appeared [1] 125:20
appropriate [28] 20:12
21:13,19 24:25 26:10
27:20 28:12 33:18 34:3
35:1,18,21 36:17 37:5
38:3 46:11 74:16 76:1
105:13 106:22 118:17
137:5 139:24 150:24
156:5 158:7,14 159:2
appropriately [4] 13:21
153:9,23 159:11
approve [2] 22:21 23:2
April [29] 123:1,19,23,25
124:3,4,8,9,11,14,18,19
124:20,21,23 125:14
128:3,6,10,15,19,25 129:7
129:12 130:4 146:20
159:24 160:3,7
area [9] 40:24 47:14 73:9
129:9 136:24 148:7,18
151:2 155:13
areas [5] 91:2 94:20,23
138:24 151:1
arises [1] 27:13
arose [1] 32:10
arrived [1] 62:2
ascribed [1] 38:4
ASPN [1] 9:2
assigned [1] 114:24
assist [5] 114:15 115:3
135:25 149:19 152:11
Assistant [1] 5:13,24
assisted [2] 97:4 144:15
assisting [1] 114:22
assumed [1] 6:16

assuming [1] 81:6
attach [2] 154:23,24
attached [2] 123:18
158:3
attempt [3] 26:19 33:25
35:3
attended [1] 63:11
attention [19] 32:5 40:10
40:33 44:22,24 45:1 53:5
59:16 79:13 94:1,10,15
101:4 103:14,24,25 104:5
148:25 154:5
attorney [2] 4:8,10
attorney's [1] 38:7
audit [132] 40:3 41:10,11
41:...2,15 42:16,18,22 44:3
44:25 45:5,6 49:22,23
49:25 50:2,10 51:25 56:7
56:9,13,18,20 69:13 70:13
81:8,12,14,16,17,20 82:3
82:..21 83:2,7,13 85:21
86:5 87:6,9,19,22 88:1,8
88:22 89:11,12,18 90:4,9
90:1,13,15 91:11,23 92:3
92:5,7,10,13,15 93:5,15
93:21,24 94:1,4,9,10,14
94:15 95:4,6,19 96:7,14
96:15,17,21,23 97:1,4,5
97:21,23 98:1,4,9,11
108 7 114:5 115:8,10,12
117 23 118:16 119:4,17
122 3,7,12,19 123:14
124:9,10,14,22 130:13
138 8 144:12,15,16,19,25
149:9,16,20,21 150:15,17
150:21 151:19,20,23
152:1,9,12 156:19,22
157:7
audited [1] 41:17,19,22
42:13 44:8 87:14 91:16
91:18 93:7 99:17 139:3
150:3 151:2
auditing [1] 153:11
auditor [4] 48:6,8,15,19
auditors [1] 48:22
audits [17] 82:11 90:6
91:14 92:18 93:3,17 94:7
95:1 123:15 130:16
135:18 136:18,22,25
137:20 139:8 150:22
August [1] 58:6
author [1] 79:21
automatic [1] 134:24
automatically [1] 20:2
available [9] 21:5 75:12
76:21 77:16 78:19 116:4
134:23 135:10 139:8
avoid [4] 62:18 63:19
76:3,14
aware [28] 49:21,23 50:2
55:5,16 63:3,6,16 71:15
72:1,4,12,25 93:4,12 94:5
98:7 100:23 101:2 107:11
107:16,19,20 121:21
125:9 127:6,21,24
awareness [1] 99:16

**-B-**

backed [1] 96:13
background [1] 4:21
backlog [2] 114:12,16
backs [1] 156:3
based [10] 22:12 27:7
80:17 92:17 108:4 125:4
127:21 130:16 150:4
156:6
basis [2] 55:23 84:14
Bates [3] 143:13 154:15
155:2
became [6] 6:14 7:23
39:2,7 55:5 100:23
become [6] 6:4 39:4 90:5
101:2
becomes [1] 135:10
began [5] 56:21 67:6
95:19 114:5,19
beginning [7] 18:23 37:7
37:21 58:17 84:7 101:19
133:24
begun [1] 149:10
belief [1] 55:24
beneficiaries [2] 44:12
44:20
best [8] 54:11 65:15 78:23
82:25 118:25 120:23
122:16 124:6
Beth [11] 67:15,18,20,21
70:22,25 71:4 74:5,6 79:4
145:15
better [3] 83:12 158:18
between [8] 15:12 54:25
58:7 72:2 73:2 90:14
93:22 111:24
beyond [2] 25:2 26 7
bill [15] 8:21 10:18 18:10
18:12 21:1,14 29:17 33:18
34:3 35:18 37:5 57:21
106:22 125:20 146:25
billed [52] 8:21 22:.6
52:18,20,24,25 53:3 57:17
57:18,21 74:17 78:17
80:15 98:18 104:22
105:14,14,15 106:22,23
111:22 113:11,12 115:7
116:8,21,24 117:8 1·8:14
120:6 126:18,22 127:25
128:5,9,14,15 129:1
133:10 140:6,13,17 58:7
158:10,12,24 159:2,4,11
159:15,17,19
biller [18] 12:20,23 13:5
14:1 20:9,10 29:13 32:22
62:7 80:20 89:24 99:19
104:11 114:18 119:5
142:20,23 144:14
billers [10] 13:3,7,10,20
49:10,16 55:3 110:14
111:3 158:8
billing [172] 7:4 8:4 9:8
9:24 10:12,5,11,13,22,22
10:25 11:5,13,15,21,23
13:22 14:1 15:13,14,16

18:15 19:19,21,22 20:3
20:16,19 21:25 23:12,17
24:15,15 25:1 26:2,3,8
27:20 28:18 29:3 31:3
33:13,15,24 34:14 36:13
37:4 38:16 46:19,24 51:24
52:4,7,9,11,13,14,16
53:12,15 56:6 57:8 59:7
59:14 60:19,21 61:17
62:12,18 63:11,20 65:11
65:13 66:9,13 67:7,24,24
68:4 69:8,9,24 70:6 71:24
73:1,8,11 74:24 75:16
76:3,14,20 77:18 78:12
80:14 84:13 85:5 87:7,10
87:11,15,18,21 88:19 89:1
90:3 94:5 95:12,15,23
100:24 101:2,11 104:3,9
105:11 109:14 110:12
112:25 113:6 115:4 116:5
116:16 117:7 119:1,13
127:4,12 128:17,20,21,24
129:7,12,15 130:3,6
133:10,13 134:6,12,16
136:21 140:2,3,7,9,24,25
141:4,5,17 143:22 144:6
144:22,24 145:2,24 149:7
149:12,13,15 150:7,8,14
150:18,19 151:15 152:7
153:14 158:23
billings [16] 11:6 32:17
56:17 66:12 85:9,11 100:8
102:25 103:16 125:9,12
147:10,12 153:5 156:23
159:9
bills [37] 8:10 9:5 12:2,3
12:13,14,16,22,25 14:7,8
14:9 15:1 16:23 17:5 26:2
28:4 35:12 36:8 39:3
87:13,22 88:1,3,8,14
91:16,18 98:13 99:6,11
100:25 102:6 137:19
145:20 146:19,22
bit [1] 147:4
blush [1] 157:20
Bonnet [9] 103:21,24
104:23 105:9 107:20
145:21 146:9 147:2,6
books [1] 91:12
boss [3] 83:11 108:10,11
break [8] 5:20,23 24:5,6
24:10 79:7,8,9
breakdown [1] 159:5
brief [1] 5:19
briefly [2] 5:5 79:19
bring [2] 44:25 103:25
brought [2] 32:4,22 40:22
53:4 101:3 103:13,24
104:5
BS/BA [2] 4:24 5:1
build [2] 25:23
built [6] 21:8 28:15 34:14
76:10,17 153:23

**-C-**

calls [3] 50:5 51:18
120:12
Cancer [1] 51:5

capacity [3] 5:15,24 6:18
capture [5] 35:23 125:5
125:11,22 153:4
carbon [4] 131:2 132:7
143:18 147:20
Cardiac [1] 5:11
cardiologist [12] 22:16
22:17,22 23:3,4,9,12,18
29:16 140:19 141:6 142:8
cardiologist's [2]
142:10 145:17
cardiologists [1] 81:9
84:24
cardiology [91] 6:2 7:15
7:24 10:9 14:19 51:8,9,13
52:19 62:13 87:7,11,12
87:15,20 88:9 89:5,20,23
89:25 90:3,6 91:2,2 92:6
92:9,19,20 93:4,5,9,25
94:9,9,14,18 95:7 98:13
99:6,11,13,14,19 101:6
101:15,25 102:9 108:8,16
109:13 111:4 114:20
119:1,5,6 120:1 122:4,8
122:14 130:17 131:3,10
131:11,14,19 132:1,4,5
136:8,20,23 137:18,19,22
137:24,25 138:7,9,11,20
138:24 144:2,14 145:1
148:7,18 149:3,12 150:18
151:1 157:17
cardiovascular [1]
113:10
care [9] 4:25 5:8,10,10,11
5:12 6:11,13 43:13
career [1] 6:19
carrier [5] 19:24 20:23
21:2 89:4 133:11
carriers [8] 20:15,17 31:2
106:11 119:24 120:6,9,16
case [4] 4:8,11 71:8
135:13
cases [14] 85:23,25 86:10
86:16 87:2 157:19,21
158:4,11,15,25 159:1,12
159:18
Castle [1] 4:24
catch [2] 77:23 153:24
catches [2] 126:2,7
catching [1] 114:15
category [1] 47:23
caught [4] 112:24 113:3
113:17 114:12
caused [1] 46:2 104:9
causes [1] 29:12
cc'd [1] 157:16
Center [1] 51:5
certain [19] 6:24 8:8 30:6
55:25 56:11,15 57:8 58:2
65:13 66:18 81:25 88:5
90:21 93:21 97:9 100:20
134:20 147:5 152:10
certainly [3] 46:6 72:20
107:20
certainty [1] 55:17
change [1] 85:3

changed [4] 38:20,24,24
125:10
changes [1] 45:7
characterization [1]
62:8
charge [66] 10:20,21
11:16,17,19 12:5 16:2,3,8
16:11,12,20 17:24,25 18:4
18:10,11 19:20,23 21:4
24:23 26:17 28:12,13
29:12 57:22 59:23 60:1
60:10 61:1 62:21 64:11
75:22 76:1,19 78:14,15
89:25 101:7,18 102:19
103:5,10 104:13,17,19,20
105:11 106:21 109:22
110:6 111:6 116:2,3,5,8
116:14 117:11,24 118:3
118:17 125:18 134:21
135:8 137:4 158:22
charged [3] 89:4 102:2
137:3
charges [146] 11:7,25
13:9,12,13,15,15,19,21
14:4,4,12,13,16,18,21
15:17,24 16:15,20,25 17:1
17:2,7,8,9,18,19,21,22
18:19,19,20,23,25 19:8,9
19:10,11,13,18 24:19 25:5
25:8 58:11 60:14 61:6
66:16,16 75:3 77:7,19
88:17,25 89:2,7,11,20
92:12,15 95:11,24 98:17
99:20 100:3 101:22,24,25
102:2,4,8,10,15 103:4
105:8,10,13,17 106:7
108:16 109:3,7,11,19
110:7,16 111:4,16,21
112:2,5,12,17,18 113:5,8
113:19,23 114:11,17
115:5,5,24 116:12,18,20
116:23 117:13 118:17,21
119:21,23 120:5,24
121:23 125:5 126:17,17
126:21 127:22,25 131:25
132:3,5 133:10 134:13,23
135:2,19,22 136:1,4,5,7
136:15 137:1,6,13,21
138:5 139:24 142:24
145:3 150:24 153:22
158:1
chart [1] 46:22
check [6] 21:9 29:6 65:11
67:23 86:6 114:1
checking [2] 21:18 115:3
Chenaridds [2] 103:21
146:10
Chet [26] 50:16 51:2 53:4
56:11,20 62:13,15,19,24
63:6,13,17 69:5,8,13,16
70:5,13 100:19 101:16
107:10 108:13,21 111:8
111:24 112:21
chosen [2] 42:16,18
Christopher [1] 103:21
Cindy [121] 4:11 53:6,7,8
55:2,7,10,22 57:13,25
58:9,24 59:9,12 60:4,11
60:18 61:14 62:1,6,11
63:3,18,23 64:13,25 65:2

65:10,17,23 66:8,25 67:22
68:1,5 69:6,11,12,18,21
69:23 70:12,19,21 71:5
75:5,11,17,21 76:9,14,23
78:1,24 88:2 89:8,10,12
89:23 90:22 91:16,24 92:3
99:5,10,14,18,25 100:7
100:12,14,17,20 101:12
101:20 103:1 104:10,11
105:7,12,16 106:17 107:6
108:9,11 109:11,18,18
110:3,8,23 111:1,7,25
112:3,15 113:14 115:9,15
115:20,24 117:6,9 119:4
136:3,6 137:11,21 138:4
141:21 144:4,21,23 145:1
145:2 149:23 152:2
159:25 160:3,6,8
Cindy's [10] 77:1,6
95:20 96:3 97:25 98:21
101:20 111:13 112:8,9
circumstance [2]
140:23,24
circumstances [5]
15:20,22 16:5 22:20 23:1
cited [3] 81:2 83:3 152:19
claim [34] 11:2 20:1,1,3
20:4,5,6,11,22,24 21:5,5
21:7,11,17,21 26:8,10
27:4,13,15 28:17,19 32:23
37:6 74:10,11 76:18 85:4
125 24 126:23 127:5,7
158:24
claims [22] 8:9 24:21
33:15 35:15,17 37:3 44:7
77:24 80:20 123:1,19,23
124:4 125:23 126:19
128:3,6,10,15 129:7,12
147:13
clarification [4] 28:18
33:16 36:14 37:4
clarify [2] 20:9,11 21:12
32:18 58:23 92:1 96:8
102:3
clean [9] 20:1,6,24 21:2,5
21:7,11,17,20
cleanest [1] 11:2
cleanly [1] 8:9
clear [1] 155:2
Clinical [5] 5:14,25
close [2] 59:4 113:24
code [8] 13:21 42:20,23
42:24 43:2 44:18 113:13
150:3
codes [6] 41:17,18,22
42:13 46:18 113:12
coding [1] 110:11
collection [2] 71:8
151:22
combined [1] 89:12
coming [6] 13:5 14:7
37:1 59:20 125:19 158:6
comment [1] 157:12
comments [2] 155:18
157:10
communicate [1] 63:25
communication [1]



**company** [1] 25:22

**compare** [3] 61:15
148:12 159:3

**compared** [5] 42:20 48:5
88:15,25 142:10

**comparing** [1] 24:7

**comparison** [5] 62:18
63:5,19 95:11 156:25

**comparisons** [1] 4:15

**complain** [1] 102 14

**complained** [1] 104:23

**complaint** [3] 104:24,25
105:3

**complete** [10] 27:20 40:4
61:3,6 93:19 105:4 110:25
136:22 137:1 154:9

**completed** [19] 16:17
17:21 92:5 93:5,6,17,20
93:24 94:2,11,16 95:21
96:2,3 104:17 105:8
109:21 118:15 135:19

**completely** [8] 6:10 26:4
27:12 116:11 138:1,2,12
153:6

**completeness** [1]
110:20

**completing** [1] 116:13

**completion** [1] 93:13

**complex** [8] 10:13 51:24
56:6 69:9 70:7 75:2 140:9
153:12

**complexity** [1] 43:12

**compliance** [37] 25:21
48:21,23 49:9 82:1,2,6
87:5,24 89:13 90:5,12,15
90:23 91:5,17,18 92 2,5
95:2 98:3,7,9 122:9,13,18
123:12,14,15 130:15
139:3 144:13 149:15
151:24 152:11 155:21
156:20

**complicated** [1] 1..13

**complies** [1] 155:6

**component** [16] 9:6,9
13:2 14:19 16:1 18:1,7
22:4 57:7,9,12 89:25
104:21 110:4 137:2 ...41:9

**components** [4] 43:10
58:12 111:5 140:9

**computer** [9] 14:20 23
80:1 117:15 125:11,12
126:2,6 134:25

**concerning** [12] 19 8
32:17,19 53:12,15 65:19
69:22 72:25 87:22 97:23
131:2 136:14

**concluded** [1] 160: 4

**concludes** [1] 43:24

**conclusion** [8] 44:5
55:25 80:13,17,19 126:6
126:15,15

**conclusions** [1] 98:4

**conclusive** [1] 84:12

**conduct** [2] 90:6 91:10

**conducted** [2] 144:13
157:7

**conducting** [5] 33:3
130:14,15 152:9 156:20

**confirm** [1] 60:16

**confirmed** [1] 58:10
59:8 67:13

**confronted** [1] 109:1

**confused** [1] 64:17

**congestive** [1] 6:15

**connected** [1] 144:24

**connection** [5] 64:24
65:9,12 76:4,5

**consider** [2] 108:22
119:7

**consistent** [1] 43:15

**constructing** [1] 35:3

**consultation** [1] 25:20

**contained** [1] 82:20
118:5 142:12

**contention** [3] 65:17,21
65:23

**context** [5] 72:16 132:19
149:17 156:9,14

**continue** [3] 30:25 31:2
153:10

**continued** [2] 127:12
160:14

**continuing** [5] 30:14
59:9 111:15 156:19,22

**contribute** [1] 21:20

**conversation** [7] 57:14
107:18 112:22 113:14
114:25 125:2 154:12

**conversations** [8] 56:2
63:13 66:24 67:3,14 83:4
113:21 126:13

**conveyed** [3] 111:8
112:14,21

**coordinate** [2] 56:19
57:4

**coordinated** [12] 51:24
56:7,17,21,23 57:1,2
69:10,13 75:8 76:2 79:4

**coordinating** [2] 69:12
71:6

**coordination** [1] 43:13

**coordinator** [1] 6:14

**copied** [5] 53:9 131:2
132:8 143:18 156:12

**copies** [9] 57:15 58:13
58:25 59:5,13 60:4,12
61:15 62:17 63:4,19,22
64:15 65:1,11 66:9,18
67:5,6,23 75:7,11,18,24
76:24 77:2,4,14 78:25

**copy** [6] 58:1 63:24 76:15
77:12 78:2 147:20

**Cornman** [21] 50:17 51:2
56:20 62:13,15,20,24 63:6
63:17 69:5,14 70:5,13
100:19 101:16 107:10
108:13,21 111:9,24
112:21

**Cornman's** [1] 53:5

**Coronary** [1] 5:11

**corporation** [1] 9:2

**correct** [48] 7:25 12:15
13:4,8,11,14,18 14:10,22
18:13 20:21 21:15 22:23
22:24 23:13,14 25:10
26:18 27:19 28:5 32:10
34:16 35:4 38:7 46:3 54:4
54:6 59:15 69:14,16 77:8
86:8 89:15 92:21,22 95:3
96:5 104:6 106:3,5 118:20
138:22 140:6 145:22
146:20 153:15 155:19
160:8

**corrected** [5] 20:14
84:15,17,21 118:14

**correcting** [1] 153:11

**corrections** [1] 34:18

**correctly** [5] 25:4 27:5
34:5,9 48:3 116:19 121:24
146:22,24

**correspondence** [2]
60:15 63:17

**corresponding** [1] 44:7

**costs** [1] 18:2

**counsel** [2] 71:23 72:7

**Counseling** [1] 5:11

**couple** [10] 84:5 104:24
104:25 105:2,3 106:2
107:4,12,23 143:8

**covered** [1] 151:21

**covers** [1] 147:21

**Crawford** [5] 143:18,20
147:19 149:2 157:16

**created** [9] 25:12 95:8,9
95:18 96:11,12 98:14,20
98:24

**creates** [1] 25:11

**credit** [1] 29:12

**critical** [5] 5:7 6:11,13

**current** [4] 90:15 114:11
114:16 143:21

**Cynthia** [1] 83:11

## -D-

**Dan** [1] 4:7

**data** [8] 10:16,25 11:20
21:5 22:23 27:7,9 61:13

**date** [12] 50:14 54:20 56:3
83:1 95:17 110:25 132:6
132:12 135:6,8,9 160:15

**dated** [7] 39:13 53:23
55:6 122:25 141:19
143:17 146:19

**dates** [4] 73:2 124:3 139:2
139:4

**dating** [1] 124:8

**days** [7] 93:13 112:23
113:3,15,15 114:8,8

**December** [18] 88:13
97:2 100:1 101:21 103:3
103:4 109:10 112:25
113:22,23 114:11,17
136:13 137:12,25 138:20
138:25 139:5

**decided** [1] 119:16

**decision** [3] 43:11 108:4
111:23

**DeFabio** [10] 40:15,15
41:3 45:9,16,17 46:7,11
47:19 50:1

**defense** [1] 72:7

**define** [1] 158:19

**Degree** [1] 4:24

**delete** [5] 24:22 108:16
116:23,25 117:1

**deleted** [43] 87:13,22
88:1,3,8 89:3,7,11 91:16
95:13 98:13 99:5,11 102:9
105:19 108:18,19,25
109:3,8,16,17,20 115:5
115:24 116:10,12,17,20
117:3,9,25 118:4,21 119:9
119:21,22 120:5,25
121:24 132:5 135:20,22

**deleting** [1] 107:22
137:21 138:4

**deletion** [12] 115:14,18
117:16,19,22 118:2,7,7
118:13 131:25 132:2
137:13

**deletions** [25] 91:24 92:4
92:11,15 100:10,11,13,16
100:21 102:4 115:22
118:8,12 136:4,5,7,14
137:11,24 138:9,11,19,23
149:23 150:24

**delivered** [1] 99:1

**Deloplaine** [7] 4:2,18
50:18 51:15 52:1 56:8,18

**denial** [3] 26:9 27:1,2

**denials** [6] 20:16,20 26:8
26:25 31:1 59:20

**department** [65] 6:18 7:4
14:3,19 19:15 25:16,17
25:19,21 29:6 30:1,4,7,11
30:15,16,17 31:20 36:17
37:1 38:17,23 43:6 47:8
48:21,23 49:9 52:19 60:8
67:7 78:9 82:2,7 87:5,16
87:18 88:12,16 90:5,23
91:5 92:5,9 96:12 98:10
109:13 110:12,16 111:4
111:12 113:6,8 119:2,12
127:1 130:13,15 138:10
139:3 143:23 144:13
146:18 149:18 151:24
156:20

**departments** [10] 38:22
52:20 90:7 92:12 94:19
136:23 137:19,22 138:6
138:12

**depending** [1] 108:23

**Deposition** [6] 64:23
72:9 77:21 81:17 145:9
152:13

**describe** [4] 5:5 41:21
71:10 98:11

**described** [1] 57:25

**description** [1] 137:10

**designed** [1] 134:25

**despite** [1] 126:18,22

147:11

**detail** [1] 113:7

**detailed** [2] 43:10,10

**determination** [1]
142:21 152:6

**determine** [30] 20:5
26 22 27:15 28:19 36:12
41 14 46:12,25 47:5,8,10
57 16 70:8,16 86:14,25
89 6 108:15 117:19
123:18 129:13 130:5
140:2,15 141:2,12 142:23
144:5,22 159:8

**determined** [4] 46:5,8
142:14,16

**determines** [1] 27:8

**developed** [1] 58:24

**different** [15] 15:10 23:5
23:7 24:3,4 88:4 97:7
120:16,17 138:1,3 140:21
148:8

**differently** [1] 14:11

**difficult** [1] 133:20

**difficulty** [1] 116:22

**diligent** [1] 153:21

**Diploma** [1] 4:22

**direct** [4] 79:12 100:18
148:25 154:5

**directed** [3] 143:17
154:10 155:9

**Directing** [1] 40:10

**directions** [1] 78:1

**directly** [10] 15:18 16:6
16:7,12 42:17 43:7 86:20
86:23 110:23 117:13

**director** [21] 6:2 7:3,8,13
7:15,20,23 8:1,3 10:9,10
19:15 22:25 40:17 51:9
62:13 81:17 120:1 123:12
143:21 144:2

**Directors** [1] 40:19

**disciplinary** [9] 106:16
106:19 107:6,21 108:9,12
108:22 109:9,4,8

**discipline** [1] 127:6

**disciplined** [1] 127:3

**discover** [3] 99:5,10
146:21

**discovered** [8] 65:25
111:2,14 112:13 127:5,10
127:13 137:12

**discovery** [3] 72:18,23
156:15

**discrepancies** [1] 89:22

**discrepancy** [2] 100:24
101:5

**discuss** [1] 72:2

**discussed** [3] 41:15 63:8
101:12

**discussing** [1] 133:8

**discussion** [1] 101:17

**Division** [1] 51:13

**doctor** [13] 16:22 22:22
23:2,3,4,9,17 29:15,16